The TRAVELERS INDEMNITY COMPA-
NY and Northbrook Property & Casual-
ty Insurance Company, Appellants–De-
fendants,

v.

SUMMIT CORPORATION OF AMERICA
and Summit Finishing Company,
Inc., Appellees–Plaintiffs.

No. 49A05–9711–CV–480.

Court of Appeals of Indiana.

Aug. 30, 1999.

John A. MacDonald, Anderson Kill & Olick, Philadelphia, Pennsylvania, Frank J. Deveau, Steven C. Shockley, Sommer & Barnard, Indianapolis, Indiana, Amicus Curiae Indiana Manufacturers Association.

James E. Rocap, Rocap Witchger & Threlkeld, Indianapolis, Indiana, Charles W. Browning, Richard G. Szymczak, Plunkett & Cooney, Detroit, Michigan, Attorneys for Appellant The Travelers Indemnity Company.

Maxwell Gray, Lowe Gray Steele & Darko, Indianapolis, Indiana, Stephen M. Kelley, Timothy J. Clarke, Kelley Casey & Clarke, Detroit, Michigan, Attorneys for Appellant Northbrook Property and Casualty Insurance Company.

Laura A. Foggan, Marilyn E. Kerst, Gregg A. Fisch, Wiley Rein & Fielding, Washington, D.C., Dennis F. Cantrell, Bingham Summers Welsh & Spilman, Indianapolis, Indiana, for Amicus Curiae Insurance Environmental Litigation Association.

George M. Plews, Jeffrey D. Featherstun, Plews Shadley Racher & Braun, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

SHARPNACK, Chief Judge

Northbrook Property and Casualty Insurance Company ("Northbrook") appeals the trial court's grant of partial summary judgment with respect to Summit's claim for coverage under its insurance policies with Northbrook. Northbrook challenges this grant of partial summary judgment on five grounds, which we restate as:

1) whether Connecticut law or Indiana law should be applied to the action;

2) whether the term "suit" in the insurance policies includes environmental administrative actions;

3) whether the term "damages" in the insurance policies includes environmental clean up and response costs;

4) whether the "absolute pollution exclusion" provision of the insurance policies unambiguously bars environmental claims; and

5) whether "personal injury" provisions in the insurance policies provide coverage for these environmental cleanup claims.

We affirm.

### FACTS

The relevant facts follow. Northbrook insured Summit from 1988 to 1996 under comprehensive general liability ("CGL") primary and umbrella/excess liability policies. Summit is a Connecticut corporation that is also headquartered in Connecticut. Northbrook is an Illinois corporation with its home office in Illinois. Summit's principal business is the manufacturing and finishing of metal parts. Summit has owned and operated facilities throughout the United States. Several sites with which Summit is involved have released chemicals into the environment. The United States Environmental Protection Agency ("EPA") and other environmental agencies have ordered Summit to clean up the contaminants at its various sites. There are seven sites at issue in this case that are located in Indiana, Illinois, Connecticut, and California.[1] The sites are:

"[1] At Summit's former Mooresville, Indiana plant, where various chemicals associated with Summit's metal electroplating operations were discovered in 1989 which are the subject of a soil and groundwater cleanup.

[2] At the Enviro–Chem Site, Boone County, Indiana, a facility which is the subject of a 1984 government cleanup order to Summit along with other companies where some of Summit's Indiana wastes allegedly were transported in 1982.

[3] At the Great Lakes Asphalt Site, Zionsville, Indiana, a facility which is the subject of another government cleanup order to Summit along with other companies, where some of Summit's Indiana wastes allegedly were transported in 1982.

[4] At the Third Site, Boone County, Indiana, a facility which is the subject of a 1996 government cleanup order to Summit along with other companies, where some of Summit's Indiana wastes allegedly were transported in 1982.

[5] At Wastex Research, Inc., East St. Louis, Illinois, a solvent recovery facility which is the subject of a 1989 government cleanup order to Summit along with other companies, where some of Summit's Indiana wastes allegedly were transported from 1983 to 1989.

[6] At Summit's Thomston, Connecticut plant, where various chemicals associated with Summit's 1980 to 1986 metal electroplating operations were removed and cleaned up in the soil and groundwater in response to a 1986 government cleanup order. In addition, there are claims arising from a release of chemicals associated with Summit's electroplating operations which are the result of a testing well accidentally drilled through an impoundment in 1991.

\* \* \* \* \*

[7] At Summit's Mountain View, California plant, where various chemicals associated with Summit's 1984 to 1989 metal electroplating operations

---

1. This case originally involved eight sites. Summit has withdrawn its claim against Northbrook for insurance coverage at Solvents Recovery of New England, Inc., Southington, Connecticut. Summit claims that it has withdrawn this claim because of the very small monetary amount at issue at this site.

at the facility were the subject of a 1989 government cleanup order."

Record, pp. 3534–3535.

On June 23, 1995, Summit filed a complaint for declaratory relief against Northbrook.[2] Summit sought a declaration that Northbrook had a duty to defend and indemnify Summit for certain environmental liability claims made against it by state or federal regulatory agencies or third parties. Summit filed a motion for partial summary judgment seeking declaratory rulings on certain policy provisions. The Travelers filed a motion, joined by Northbrook, seeking a determination, pursuant to Ind. Trial Rule 44.1, that this action is governed by Connecticut law. Northbrook requested that the trial court decide the choice of law question before it was required to brief its response to the remaining substantive issues in Summit's motion for summary judgment. After a hearing, the trial court denied the defendant's motion to rule on the choice of law issue before ruling on the motion for partial summary judgment.

On July 21, 1997, the trial court issued its Findings of Fact, Conclusions of Law, and Order on Summit's motion for partial summary judgment and defendant's cross-motion on choice of law. The order, in relevant part, read as follows:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that, there being no just cause for delay, the Court enters final partial judgment pursuant to Rule 54(B) of the Indiana Rules of Procedure on the following issues:

(1) that this action is governed by Indiana law;

(2) that, in addition to traditional judicial actions, "suit" in ... Northbrook's policies includes environmental administrative actions like those brought against Summit;

(3) that the meaning of the term "damages" in ... Northbrook's policies includes environmental cleanup and re-

sponse costs like those incurred by Summit.

\* \* \* \* \*

(5) that the "personal injury" provisions in ... Northbrook's policies provide coverage for environmental cleanup claims against Summit; and,

(6) that the "absolute pollution exclusion" in ... Northbrook's policies is ambiguous and does not bar coverage for these environmental claims."

Record, p. 3564.

## STANDARD OF REVIEW

In reviewing a decision on summary judgment, this court applies the same standard as the trial court. *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 261 (Ind.1994), *reh'g denied;* Ind. Trial Rule 56(C). We construe the pleadings, affidavits, and designated materials in a light most favorable to the nonmovant and give careful scrutiny to assure that the losing party is not improperly prevented from having its day in court. *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.Ct.App.1997), *trans. denied.* When there are material disputed facts, or if undisputed facts give rise to conflicting reasonable inferences that affect the outcome, they must be resolved in favor of the nonmovant. *Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 104 (Ind.1997). The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was erroneous. *Jordan v. Deery*, 609 N.E.2d 1104, 1107 (Ind.1993). "The construction of an insurance contract is a question of law for which summary judgment is particularly appropriate." *State Farm Mut. Auto. Ins. Co. v. Gonterman*, 637 N.E.2d 811, 813 (Ind.Ct.App.1994).

## DISCUSSION

### I.

The first issue is whether Summit's contract action should be governed by Connecticut or Indiana law. Northbrook asserts

---

**2.** The original suit was filed by Summit against The Travelers and Northbrook. Since then, Summit and The Travelers have settled their

dispute leaving Northbrook as the only defendant.

that there is a conflict between Indiana and Connecticut law requiring a choice of law analysis. For the purposes of our analysis, we will assume that a conflict exists.

▮▮▮ Indiana follows the approach formulated by the RESTATEMENT (SECOND) OF CONFLICT OF LAWS when deciding which law to apply when there is a conflict. *Dana Corp.*, 690 N.E.2d at 291; *Eby v. York–Division, Borg–Warner*, 455 N.E.2d 623, 626 (Ind.Ct.App.1983). If the parties have not made an effective choice of law, the court will consider the different contacts the parties have with the forums at issue. *Dana*, 690 N.E.2d at 291 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)). Indiana's choice of law rule for contract actions calls for applying the law of the forum with the most intimate contacts to the facts. *Id.* We will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact. *Id.* The specific issue we address here is whether Connecticut or Indiana has the most intimate contacts with this action, requiring application of its law.

▮▮▮ Northbrook argues that Connecticut law should apply because the estimated cost of cleaning up the site in Connecticut is the highest and, therefore, Connecticut is the location with the most intimate contacts. Summit argues that Indiana law should be applied because the principal location of the risk is in Indiana due to four of the sites being located in this state. The contacts we consider include:

"(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties."

*Dana*, 690 N.E.2d at 291 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971)). We have previously decided that when applying this test in the context of an insurance contract, the most important contact is the *principal location of the insured risk* during the term of the policy.[3] *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193 (1971) (emphasis added)). The rights created by the insurance contract are determined by the law of the state where the risk or subject matter is located. *Id.*

In *Dana*, a case very similar to the facts at issue, a manufacturer of automotive components ("Manufacturer") with locations across the United States became subject to environmental contamination actions. *Dana*, 690 N.E.2d at 287. Sixty-three of Manufacturer's facilities in nineteen states were involved. *Id.* Manufacturer made claims under its CGL insurance policies and was denied coverage. *Id.* Manufacturer then filed suit against fifty-six of the insurance carriers seeking indemnification and defense. *Id.* Twenty-five of Manufacturer's facilities were located in Indiana. *Id.* at 289. Fifteen of those sites (one-fourth of the total) were allegedly liable for environmental contamination. No other state contained more of Manufacturer's facilities than Indiana. *Id.* Twenty percent of Manufacturer's employees worked in Indiana. *Id.* The insurance contracts were issued by the insurance company's Michigan office. *Id.* The contracts were negotiated at the insurance broker's office in Michigan. *Id.* The insurance company wanted Ohio law to apply, but Manufacturer wanted Indiana law to apply. *Id.* at 291. The insurance company argued that because Manufacturer's primary place of business was in Ohio, that was where the contracting and negotiation took place. *Id.* at 292.

---

3. RESTATEMENT (SECOND) § 193 READS:
"The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the *principal location of the insured risk* during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 193 (1971) (emphasis added).

In deciding *Dana*, we looked to the RESTATEMENT (SECOND) OF CONFLICTS §§ 188 & 193. *Id.* at 291. This court held that the place of contracting was indeterminate but that Michigan was the place of negotiation. *Id.* at 293. We found that the domicile of the parties was indeterminate. *Id.* at 293. The trial court held that Indiana was the place of performance and was the location of the subject risk. *Id.* We agreed with the trial court but stated that "until all coverage issues have been decided for all sites involved, place of performance cannot be determined." *Id.* We concluded that the § 188 factors did not point in one primary direction. *Id.* at 294. Consequently, we held the principal location of the subject risk should be accorded greater significance. *Id.* Thus, we held that although the manufacturer's sites were scattered, they were principally located in Indiana. *Id.* Therefore, Indiana law was applied to the *Dana* case. *Id.*

█ Here, we first address the location of contracting. Summit's corporate headquarters are in Connecticut. Northbrook is an Illinois corporation. The contracts list Northbrook's home office as South Barrington, Illinois.[4] Northbrook's agent is listed on the contracts with a Connecticut address. Similar to *Dana*, here Northbrook contends that because Summit's primary place of business is in Connecticut, that was the place of contracting and negotiating. *Dana*, 690 N.E.2d at 292. In *Dana*, this court concluded that the mere fact that a policy holder is headquartered in a state does not mean that the law of that state controls. *Id.* at 293. Although there is no evidence regarding any contracting in the State of Indiana, the evidence that the contracting was done in Connecticut is not conclusive. Therefore, we conclude that the place of contracting is indeterminate. Moreover, "[s]tanding alone, the place of contracting is a relatively insignifi-

cant contact." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e. (1971).

█ We next address the negotiation factor. Northbrook claims that the place of negotiation points to the application of Connecticut law. Northbrook asserts that the policies were negotiated in Connecticut because its insurance personnel worked there. Northbrook does not furnish any evidence that the negotiation took place in Connecticut. It simply argues that because it had an agent in Connecticut as indicated on the front page of the contracts, Connecticut is where the contract was negotiated. There is no evidence that the agency did any of the negotiating. There is evidence that the policies were signed and endorsed in Illinois.[5] As with the contracting issue, it is unclear from the evidence whether the negotiation of the contract took place in Connecticut or Illinois. Therefore, we conclude that the place of negotiation is also indeterminate. Furthermore, the place of negotiation "is of less importance when there is no one single place of negotiation and agreement [ ] as ... when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." *Dana*, 690 N.E.2d 285, 293 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. e. (1971)).

Next, we look to the domicile of the parties. Northbrook is an Illinois corporation with its home office also in Illinois. Summit is a Connecticut corporation. Consequently, the place of domicile of the parties for choice of law purposes is inconclusive.

The remaining two factors for us to consider are the place of performance and the location of the subject matter of the risk. The place of performance has been defined as the location where the insurance funds will be put to use. *Id.* (citing *Morton Int'l Inc. v.*

---

4. Northbrook claims that there was a stamp on the insurance contracts identifying its Farmington, Connecticut office as the place where the contracts were issued. However, the only copies of the insurance policies we have found in the record do not contain such a stamp. Record, pp. 373, 412, 451. Northbrook fails to inform us of where in the record the stamped copies are located. However, the copies Northbrook had

placed in its appendix at tabs C, D, and E contain the stamps.

5. The insurance contracts state "IN WITNESS WHEREOF, Northbrook has caused this endorsement to be signed by its Secretary and President at South Barrington, Illinois." Record, pp. 374, 379, 380, 451, 454.

*Harbor Ins. Co.,* 79 Ohio App.3d 183, 607 N.E.2d 28 (1992)). The location of the subject matter for the purposes of an insurance contract has been defined as the principal location of the insured risk. *Id.;* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193 (1971). As both of these factors relate to the location where potential liability will arise in the context of insurance contracts, we conclude that they encompass the same considerations. Therefore, we are left to determine the principal location of the insured risk which, as in *Dana,* is the state with the largest number of insured sites.

▆▆▆ Summit has seven sites for which it is making indemnity claims in this case. Four of the sites are in Indiana and one site in Illinois was contaminated with wastes produced at an Indiana site. In contrast, there is only one Connecticut site. Here, the trial court determined that Indiana law applied because of its predominant number of sites. The trial court stated that "Section 193 of the Restatement (2) of Conflicts ("Restatement") provides that the 'most intimate contact' with respect to casualty insurance contracts is 'the principal location of the insured risk.'" Record, p. 3543 (citing *Rockwood Insurance v. Illinois State Medical Inter-Insurance Exchange,* 646 F.Supp. 1185, 188–1189 (N.D.Ind.1986) (applied Indiana law to dispute over insurance coverage arising from physician policyholder's practice in Indiana, under both §§ 188 and 193 of the Restatement)). Without other evidence of the probability of risks at individual sites, we must summarily conclude that as the number of sites increase so does the risk of an occurrence.[6] Therefore, as the risk of occurrences is greater in Indiana, we conclude Indiana is the principal location of the insured risk. *See Dana Corp.,* 690 N.E.2d at 294. Consequently, we conclude that Indiana is the forum with the most intimate contacts. *See id.* at 291. As such, the law of Indiana should be applied to this case. Therefore, the trial court did not err in its determination that this action is governed by Indiana law.

## II.

▆▆▆ The second issue is whether the term "suit" in the insurance policies includes environmental administrative actions. The policies provide no definition for "suit." Northbrook argues that no "suit" has been brought against Summit with regard to any of the sites.[7] Summit argues that the term "suit" includes the kinds of governmental environmental proceedings against Summit that form the basis of this action. In *Dana,* we addressed for the first time the meaning of the term "suit." *Dana,* 690 N.E.2d at 294. In order to have a suit "there must be some cognizable degree of coerciveness or adversariness in the administrative body's actions." *Id.* at 296 (citing *Ryan v. Royal Ins. Co. of Am.,* 916 F.2d 731, 738 (1st Cir.1990)). We stated that

> "[w]e agree with those courts which have found coercive and adversarial administrative proceedings to be 'suits.' To decide otherwise would encourage insureds to not cooperate with governmental agencies, thus running the risk of huge fines, punitive damages, and delay in remediating environmental pollution."

*Id.* at 296. Summit has had several claims made against it by the EPA and local agen-

---

6. Northbrook argues that we should determine the principal location of the insured risk based upon estimates of actual damage that has accrued at each site. Northbrook asserts that Connecticut is the location of the most intimate contacts because the costs associated with cleaning up the Connecticut site are the highest. When we look to the nature of the insured risk we conclude that inherently the "risk" must be determined at the time the contract is formed. If we were to use the damage sustained by the insured as the determining factor in deciding which law to apply then we would likely have inconsistency in the law used to determine other nondamage related suits involving the insurance contract. The amount of damages that might possibly be incurred in the future cannot be determined at the time the parties enter an insurance contract. We conclude that a prospective look is the best way to determine which law will be applied to a contract involving parties of different states. Therefore, we reject Northbrook's approach to determining the principal location of the insured risk.

7. Northbrook bases its argument on Connecticut caselaw to support its assertion that the term "suit" only includes monetary relief, not environmental cleanup costs.

cies for the cleanup of sites where it has disposed of waste.

The insuring agreement in the Northbrook policies reads as follows:

"We will pay those sums that the Insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies."

Record, pp. 422, 948. The policy continues to provide, "This insurance applies to any bodily injury and property damage only if: (1) the bodily injury or property damage is caused by an occurrence that takes place in the coverage territory and (2) the bodily injury or property damage occurs during the policy period." Record, pp. 422, 948. There is nothing in the policy provisions that requires that an insured become "legally obligated to pay" as a result of any particular kind of proceeding in court or elsewhere.

■ The policy does provide "We will have the right and duty to defend any suit seeking those damages. We may at our discretion investigate any occurrence and settle any claim or suit that may result." Record, pp. 422, 948. Because the liability to pay on behalf of the insured depends upon the insured being legally obligated to pay and not on the manner in which the insured became legally obligated to pay, the provision for the company to have the "right and duty to defend any suit seeking those damages" would indicate to the ordinary person that the company must defend against any proceeding or process that could result in the insured being "legally obligated to pay." Consequently, we conclude that the term "suit" here is broad enough to encompass the claims against Summit by the various environmental agencies. *See Dana*, 690 N.E.2d at 296. Therefore, the trial court did not err in its determination that "suit" includes environmental administrative actions.

### III.

■ The third issue we address is whether the term "damages" in the insurance policy includes environmental clean up and response costs. Northbrook argues that the

term "damages" does not include environmental cleanup costs. More specifically, Northbrook asserts that the costs incurred by Summit are the costs of doing business.[8] Summit argues that under Indiana law "damages" include environmental cleanup costs. The Northbrook insurance policies do not define the term "damages." Therefore, we look to our court's interpretation of "damages" in other cases. In *Dana*, we found the term "damages" in CGL policies to be ambiguous. *Dana*, 690 N.E.2d at 297–298. We concluded that the ordinary meaning of the term "damages" is so broad that it encompasses environmental response costs. *Id.* We held "that the ordinary meaning of the term 'damages' in a CGL policy includes EPA or state mandated cleanup and response costs." *Id.* Here, Northbrook insured Summit from 1988 to 1996 under CGL primary and umbrella/excess policies. Therefore, we hold that the term "damages" in the insurance contracts issued by Northbrook to Summit includes EPA or state mandated cleanup and response costs. *See id.* Thus, the trial court did not err in its determination that "damages" includes environmental cleanup and response costs.

### IV.

■ The fourth issue is whether the "absolute pollution exclusion" provision of the insurance policy unambiguously bars environmental claims. Northbrook argues that the pollution exclusion is unambiguous and excludes environmental claims. Summit asserts that the language of the pollution exclusion is inherently ambiguous and therefore the policy must be construed in favor of Summit.

The Northbrook pollution exclusion reads:

"This insurance does not apply to:

\* \* \* \* \*

f. (1) Bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

---

8. Northbrook bases its argument on Connecticut law. Specifically, the case Northbrook relies upon for its assertions is a Connecticut trial court case, *Linemaster Switch Corp. v. Aetna Life and Casualty Corp.*, Docket No. CV91–0396432S, 1995 WL 462270 (Conn.Super.Ct. July 25, 1995).

(a) At or from premises you own, rent or occupy;

(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize pollutants.

\* \* \* \* \*

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

Record, pp. 381–383 (for similar provision in the other policy see Record, pp. 423–424). Were we writing on a clean slate, we might well conclude that the language of the exclusion is clear and excludes coverage for the environmental claims against Summit. However, our supreme court has twice recently considered exclusionary language that is, for practical purposes, the same as in the exclusions here. Both with regard to the duty to indemnify in *American States Ins. Co. v. Kiger* and the duty to defend in *Seymour Mfg. Co. v. Commercial Union Ins.* our supreme court has determined the exclusion to be ambiguous and has construed it against the insurer.[9] *See American States Ins. Co. v. Kiger,* 662 N.E.2d 945, 948–949 (Ind.1996), *reh'g denied.; Seymour Mfg. Co. v. Commercial Union Ins.,* 665 N.E.2d 891, 892 (Ind. 1996), *reh'g denied.*

We follow the lead of our supreme court and conclude that the pollution exclusion in the policies here is ambiguous and is construed against Northbrook to not exclude coverage for the environmental claims made against Summit. The trial court correctly decided this issue.

## V.

■ The final issue is whether "personal injury" provisions in the insurance policies provide coverage for environmental cleanup claims. Northbrook argues that the environmental damage done by Summit is not a "personal injury." Summit asserts that the contamination is a personal injury because it constitutes a trespass or nuisance resulting in wrongful entry. This issue is one of first impression in Indiana.

■ When the policy language of an insurance contract is clear and unambiguous, it should be given its plain and ordinary

---

9. Both the *Kiger* and *Seymour* cases involved the pollution exclusion with a "sudden and accidental" exception as well as the "absolute exclusion" with no exception. In *Kiger,* that exclusion read:

"[t]his insurance does not apply to any of the following:

\* \* \* \* \*

'Bodily injury.' 'property damage' or loss, cost or expense arising out of the actual alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'

\* \* \* \* \*

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

*Kiger,* 662 N.E.2d at 948. In *Seymour,* the exclusion read:

"It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids alkalis, toxic chemicals, liquids or gases or pollutants into or upon land, the atmosphere or any watercourse or body of water. . . ."

*Seymour Mfg. Co. v. Commercial Union Ins.,* 648 N.E.2d 1214, 1218 (Ind.Ct.App.1995), *vacated by* 665 N.E.2d 891 (Ind.1996), *reh'g denied.*

meaning. *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990. Under Indiana law, an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. *Id.* Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence. *Asbury v. Indiana Union Mutual Ins. Co.*, 441 N.E.2d 232, 237 (Ind.Ct.App.1981). Where there is ambiguity, an insurance policy must be construed strictly against the insurer. *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind.1996), *reh'g denied.* This is particularly true where a policy excludes coverage. *Id.* The strict construction against the insurer is because the insurer drafts the policy and foists its terms on the potential customer. *Id.* The customer is faced with deciding whether to accept the insurance contract or forgo insurance coverage. *Id.* A division between courts as to the meaning of the language in an insurance contract is evidence of ambiguity. *Dana*, 690 N.E.2d at 295.

Here, the insurance contract in effect from February 25, 1989, to February 25, 1991,[10] reads as follows:

"1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of personal injury . . . to which this insurance applies. . . .

\* \* \* \* \*

b. This insurance applies to personal injury only if caused by an offense:

\* \* \* \* \*

(2) Arising out of the conduct of your business. . . .

\* \* \* \* \*

10. 'Personal injury' means injury, other than bodily injury,[11] arising out of one or more of the following offenses:

\* \* \* \* \*

c. *Wrongful entry into*, or eviction of a person from, a room, dwelling or *premises* that the person occupies."

Record, pp. 385, 386, 395 (emphasis added). The insurance contract in effect from February 25, 1991, to October 1, 1995,[12] reads as follows:

"1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of personal injury . . . to which this insurance applies.

b. This insurance applies to:

(1) Personal injury caused by an offense arising out of your business, excluding. . . .

\* \* \* \*

11. 'Personal injury' means injury, other than bodily injury,[13] arising out of one or more of the following offenses:

\* \* \* \* \*

c. The *wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of* a room, dwelling, or *premises* that a person occupies by or

---

10. This is policy number BPP 0291712.

11. "Bodily injury" is defined in the policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of theses at any time." Record, p. 392. In contrast, "property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property; or . . . [l]oss of use of tangible property that is not physically injured." Record, p. 396.

12. This is policy number 78 291712.

13. "Bodily injury" is defined in the policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of theses at any time." Record, p. 435. In contrast, "property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or . . . [l]oss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the occurrence that caused it." Record, p. 438.

on behalf of its owner, landlord or lessor...."

Record, pp. 427, 437 (emphasis added).

 Summit asserts that the chemicals were a nuisance or trespass which constituted a wrongful entry under the definition of personal injury in its insurance contracts with Northbrook. However, we conclude that the proper issue here is whether the facts of this case fit within the policies' personal injury coverage, not whether nuisance [14] or trespass [15] fit under the personal injury coverage. *See Titan Corp. v. Aetna Cas. & Sur. Co.*, 22 Cal.App.4th 457, 474, 27 Cal.Rptr.2d 476, 486 (1994). We look to the terms of the insurance agreement to determine whether Summit's claims are covered under the personal injury provisions of its insurance policies with Northbrook.

First, we evaluate whether the language in the contracts is clear or ambiguous. Because policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence we refer to the WEBSTER'S NEW WORLD DICTIONARY definition of the words not otherwise defined in the policies. *See Asbury*, 441 N.E.2d at 237. "Personal injury" is described in the policy as "injury, other than bodily injury...." The term "injury" is defined in the dictionary as

"physical harm or damage to a person, property, etc .... an injurious act; specif., a) an offense against a person's feelings, dignity, etc. b) loss in value inflicted on a business, reputation, etc. c) a violation of rights...."

WEBSTER'S NEW WORLD DICTIONARY 696 (3d College ed.1988). The policies use the phrases "wrongful eviction," "wrongful entry," and "invasion of the right of private occupancy" to define acts causing "personal injury." The word "wrongful" is defined by WEBSTER'S NEW WORLD DICTIONARY as "full of wrong; unjust or injurious ... without legal right; unlawful." *Id.* at 1543. "Entry" is defined

as "the act of entering." *Id.* at 454. "Invasion" is defined as "... an intrusion or infringement ... the onset or appearance of something harmful or troublesome ..." *Id.* at 710. As we find that the terms used in the policies can have a variety of meanings, we conclude that these phrases are ambiguous.

The policies also use the terms "room, dwelling or premises" to describe where the "eviction," "entry" or "invasion" occurred. One of the definitions of the term "premises" is "a piece of real estate; house or buildings and its land." *Id.* at 1063. Therefore, "premises" could include the land that was polluted in this case. The claims here involve land owned by Summit, land owned by others to which Summit sent waste, and groundwater at those sites. It is in the nature of groundwater to migrate and carry with it contaminants to neighboring land owned and occupied by others. Although it is arguable that Northbrook did not intend to provide such coverage under "personal injury" coverage, the language used is capable of meaning it covers pollution of real property of others by Summit in sending wastes to real property of others and allowing contaminated groundwater to migrate from its sites to neighboring land. Because, as a whole, the policies are ambiguous we must construe the language against the insurer and in favor of coverage. *Kiger*, 662 N.E.2d at 947.

In addition, we have reviewed decisions of other courts and our court based upon the law of another jurisdiction. It is clear that these decisions are split as to their conclusions regarding what is covered by personal injury insurance. We previously held that, under Tennessee law, pollution damage was not covered under the personal injury provision of an insurance contract. *See Osco, Inc. v. St. Paul Fire and Marine Ins. Co.*, 656 N.E.2d 548, 550 (Ind.Ct.App.1995), *trans. denied.* Some jurisdictions have also held that

---

14. Nuisance is defined as "that activity which arises from unreasonable, unwarranted or unlawful use by a person of his own property, working obstruction or injury to right of another, or to the public, and producing such material annoyance, inconvenience and discomfort that law will presume resulting damage." BLACK'S LAW DICTIONARY, 1065 (6th ed.1990).

15. Trespass is defined as "An unlawful interference with one's person, property, or rights.... Any unauthorized intrusion or invasion of private premises or land of another." BLACK'S LAW DICTIONARY, 1502 (6th ed.1990).

personal injury provisions of an insurance contract do not cover environmental damage. *See County of Columbia v. Continental Ins. Co.*, 189 A.D.2d 391, 395, 595 N.Y.S.2d 988 (N.Y.App.Div.1993) (holding that an action for environmental' damage to real property did not constitute a "wrongful entry or eviction or other invasion of the right of private occupancy" so as to come within personal injury liability coverage); *Titan Corp.*, 22 Cal.App.4th at 474, 476, 27 Cal.Rptr.2d at 486, 487 (holding that personal injuries are limited to the injury to the occupant, as distinct from the damage to realty and language such as "wrongful entry or eviction" which "connotes disruptions of the ability of a landowner to actually occupy his property, not mere injuries to the property"); *Leek v. Reliance Ins. Co.*, 486 So.2d 701, 704 (Fla. App.Dist.1986) (holding that personal injury damage coverage does not protect against property damages caused by the insured); *Robert E. Lee & Associates v. Peters*, 206 Wis.2d 509, 557 N.W.2d 457, 463 (1996) (holding "that the environmental contamination resulting from [a] gas spill does not constitute personal injury arising out of 'wrongful entry, into or eviction of a person from, a room, dwelling or premises that the person occupies.' "). Other jurisdictions have found that personal injury insurance covers environmental claims. *See Scottish Guarantee Insurance Co., Ltd., v. Dwyer*, 19 F.3d 307, 308, 312 (7th Cir.1994) (holding that under Wisconsin law damages caused by pollution are covered under the personal injury provision of an insurance policy under the terms "wrongful entry"); *Pipefitters Welfare Educ. Fund v. Westchester Fire*, 976 F.2d 1037, 1042 (7th Cir.1992) (holding that under Illinois and Missouri law damages caused by pollution are potentially covered under the personal injury provision of an insurance policy under the terms "other invasion of the right of private occupancy") *reh'g denied*. This disagreement among the courts further indicates the ambiguity of the personal injury provisions. *See Dana*, 690 N.E.2d at 295. Therefore, we conclude that the personal injury provisions of Summit's insurance contracts with Northbrook must be construed to cover the environmental damages of this suit. *See Kiger*, 662 N.E.2d at 947.

■ However, we must next determine whether the pollution exclusion applies to the personal injury coverage of Summit's insurance contracts with Northbrook. The insurance policies at issue here have different coverages labeled A, B, and C. In policy number BPP 0291712, Coverage A reads:

"1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of *bodily injury* or *property damage* to which this insurance applies...."

Record, p. 381 (emphasis added). There are a number of exclusions listed under Coverage A. Record, pp. 381–385. The exclusions include a pollution exclusion.[16] Coverage B reads:

"1. Insuring Agreement

16. "This insurance does not apply to:

\* \* \* \* \*

f.(1) Bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) At or from premises you own, rent or occupy;

(b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize pollutants.

\* \* \* \* \*

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

Record, pp. 381–383.

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of *personal injury* ... to which this insurance applies...."

Record, p. 385 (emphasis added). Coverage B lists several exclusions, but does not have a pollution exclusion. Record, p. 386. Finally, Coverage C reads:

"1. Insuring Agreement

a. We will pay *medical expenses* as described below for bodily injury caused by an accident."

Record, p. 387 (emphasis added). Coverage C also lists exclusions, but does not include a pollution exclusion. As Coverages A, B and C stand independent of each other for the purposes of the insuring agreement and exclusion, we conclude that a plain reading of these provisions unambiguously indicates that there is no pollution exclusion for personal injury. *See Eli Lilly*, 482 N.E.2d at 470.

We now look to policy number 78 291712. This policy also has different coverage sections. Coverage A reads:

"1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of *bodily injury* or prop-erty damage* to which this insurance applies...."

Record, p. 422 (emphasis added). Coverage A also lists exclusions, including a pollution exclusion.[17] Coverage B reads:

"1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of *personal injury* ... to which this insurance applies...."

Record, p. 427 (emphasis added). Coverage B also lists exclusions, but not a pollution exclusion. Record, pp. 427–428. Coverage C reads:

"1. Insuring Agreement

a. We will pay *medical expenses* as described below for bodily injury caused by an accident...."

Record, p. 428 (emphasis added). Coverage C also lists exclusions, but not a pollution exclusion. Record, p. 429. As Coverages A, B and C stand independent of each other for the purposes of each insuring agreement and exclusion, we conclude that a plain reading of these unambiguously indicates that there is no pollution exclusion for the personal injury coverage. *See Eli Lilly*, 482 N.E.2d at 470.

17. The pollution exclusion of coverage A reads:
"2. Exclusions
This insurances does not apply to:
\* \* \* \* \*
f. (1) Bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
(a) At or from any premises, site or location which is or was at anytime owned or occupied by, or rented or loaned to, any Insured;
(b) At or from any premises, site or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste;
(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any Insured or any person or organization for whom you may be legally responsible; or
(d) At or from any premises, site or location on which any Insured or any contractors or sub contractors working directly or indirectly on any Insured's behalf are performing operations;
(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such Insured, contractor or subcontractor; or
(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.
\* \* \* \* \*
(2) Any loss, cost or expense arising out of any:
(a) Request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants; or
(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of pollutants.
Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."
Record, pp. 422, 423–424.

In sum, the personal injury coverage is ambiguous requiring us to construe it in favor of coverage. Furthermore, we conclude that there is no pollution exclusion with regard to personal injury. Therefore, the trial court did not err in its determination that "personal injury" provisions provided coverage. Thus, we affirm the trial court with respect to this issue.

In conclusion, we hold that the law of Indiana applies to this case and we resolve the various disputes with regard to interpretation of the insurance policies in favor of the insured.

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

NAJAM, J., and BAILEY, J. concur