**GALLANT INSURANCE COMPANY, Appellant–Defendant,**

v.

**AMAIZO FEDERAL CREDIT UNION, and Frank Buck, d/b/a Auto Rite Body & Paint, Appellees–Third–Party Defendant/Counterclaimant/Cross–Claimant.**

No. 45A03–9905–CV–193.

Court of Appeals of Indiana.

April 17, 2000.

Kent S. Wilson, Buoscio Pera Kramer & Nowak, Merrillville, Indiana, Attorney for Appellant.

Marce Gonzalez, Jr., Merrillville, Indiana, James E. Foster, Funk & Foster, Hammond, Indiana, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge

Gallant Insurance Company appeals a judgment in favor of Amaizo Federal Credit Union (the Credit Union) and Frank Buck, d/b/a Auto Rite Body & Paint (the Body Shop) in an action brought by the Credit Union against Gallant, in which Gallant named the Body Shop as a third-party defendant. In a summary proceeding conducted by the agreement of all parties involved, the trial court entered judgment in favor of both the Credit Union and the Body Shop. Gallant thereafter filed a motion to correct errors, which the trial court denied. Gallant challenges the denial of the motion to correct errors and the underlying judgment entered against it with respect to both the Credit Union and the Body Shop. We restate the issues presented by Gallant as follows:

1. Did the trial court err in determining that Gallant was liable for wrongfully stopping payment on a settlement check?

2. Did the trial court err in awarding attorney's fees to the Credit Union and, if not, did the trial court err in calculating the amount of the award?

3. Did the trial court err in entering judgment in favor of the Body Shop and against Gallant?

We affirm in part, reverse in part, and remand with instructions.

The facts favorable to the judgment are that Jack Blanton was a member of the Credit Union. In May 1995, Blanton obtained a loan from the Credit Union to purchase an automobile. Blanton obtained an insurance policy for the auto through Gallant. Blanton was the named insured and the Credit Union was designated as loss payee in the policy. The policy was effective from October 24, 1995 to April 24, 1996, and provided comprehensive and collision coverage. The insurance contract contained the following provision with regard to the comprehensive coverage:

> At the company's option to have repaired or to pay for loss caused other than by collision to the owned automobile or to a non-owned automobile but only for the amount of each such loss in excess of the deductible amount stated in the Declarations as applicable hereto.

*Record* at 174. The collision coverage contained the following provision:

At the company's option to have repaired or to pay for loss caused by collision to the owned automobile or to a non-owned automobile but only for the amount of each such loss is [sic] excess of the deductible amount stated in the Declarations as applicable hereto.

*Id.* The policy contained the following provision concerning payment of loss coverage:

The company may pay for the loss in money; or may repair or replace the damaged or stolen property; or may, at any time before the loss is paid or the property is so replaced, at its expense return any stolen property to the named insured, or at its option to the address shown in the declarations, with payment for any resultant damage thereto; or may take all or such part of the property at the agreed or appraised value but there shall be no abandonment [to?] the company. The company may settle any claim for loss either with the insured or the owner of the property.

*Id.* at 176–77.

On or about December 20, 1995, Blanton's automobile was stolen in Calumet City Illinois. Blanton immediately notified the Credit Union that the car had been stolen. On February 26, 1996, Gallant prepared a check in the amount of $16,-570.50, designating both the Credit Union and Blanton as payees. In a notification form dated February 28, 1996, the Calumet City Police Department sent notification to Blanton that his stolen vehicle had been recovered. On March 1, Gallant sent the settlement check to the Credit Union, along with a letter explaining that the check was for the stolen auto, and asking that the Credit Union send the car's title to Gallant. On March 7, 1996, the Credit Union forwarded the car's title to Gallant. On March 8, after Blanton and the Credit Union endorsed the check, the Credit Un-

ion deposited the settlement check into its own account. On March 11, the Credit Union's bank presented the settlement check to the payor bank. By March 14, 1996, Blanton had secured another loan from the Credit Union and replaced his auto. On that day, Gallant learned that Blanton's automobile had been recovered and that it was repairable, and informed the Credit Union of same. Gallant also informed the Credit Union that it was issuing a stop payment order on the settlement check it had previously issued to the Credit Union and Blanton. Pursuant to Gallant's direction, the payor bank stopped payment on the check.

Gallant sent the auto to the Body Shop for repairs. On April 4, the Body Shop informed Gallant that the car had been repaired, and Gallant paid the repair fees, except for a $500 deductible which it claimed Blanton owed. On April 8, the Body Shop notified the parties that it was charging a $20.00–per–day fee for storing the auto, commencing that day. Sometime in April, Gallant returned the title to Blanton's car to the Credit Union. On August 8, 1996, the Body Shop informed the Credit Union that Blanton's car was going to be sold at auction to satisfy the repair and storage debt. On August 27, the Credit Union filed a complaint against Gallant and East Side Body Shop.[1] Also on August 27, the trial court issued a stay to prevent the Body Shop from selling the car at auction. On September 11, the Body Shop filed a third-party complaint naming Frank Buck and Auto Rite Body & Paint as defendants. The parties agreed that the matter should be resolved by the trial court in summary fashion. On August 3, 1998, the trial conducted a summary hearing, after which it ruled in favor of the Credit Union against Gallant. The trial court subsequently found in favor of the Body Shop and against Gallant on the

---

1. East Side Body Shop was separate and distinct from Auto Rite Body & Paint, and apparently became involved when, as a favor to Buck, its owner wrote a letter on East Side Body Shop stationary informing the Credit Union that Blanton's car was to be sold at auction.

Body Shop's complaint to recover the $500.00 deductible and storage fees.

### 1.

The Credit Union contends that the trial court's ruling is supported on two bases. First, the Credit Union contends that Gallant's stop payment contravened statutory law. Therefore, according to the Credit Union, IC § 26–1–4–303 prevented Gallant from stopping payment on the settlement check. Secondly, the Credit Union contends that it was entitled to judgment because Gallant breached the insurance contract when it stopped payment on the settlement check.

 The trial court cited IC § 26–1–4–303 in support of its ruling against the Credit Union. That statute states, in pertinent part:

Sec. 303. (a) Any knowledge, notice, or stop-payment order received by, legal process served upon, or setoff exercised by a payor bank comes too late to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item if the knowledge, notice, stop-payment order, or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the earliest of the following:

(1) The bank accepts or certifies the item.

(2) The bank pays the item in cash.

(3) The bank settles for the item without having a right to revoke the settlement under statute, clearing-house rule, or agreement.

(4) The bank becomes accountable for the amount of the item under IC 26–1–4–302 dealing with the payor bank's responsibility for late return of items.

(5) With respect to checks, a cutoff hour not earlier than one (1) hour after the opening of the next banking day after the banking day on which the bank received the check and not later than the close of that next banking day or, if no cutoff hour is fixed, the close of the next banking day after the banking day on which the bank received the check.

(b) Subject to subsection (a), items may be accepted, paid, certified, or charged to the indicated account of its customer in any order.

We agree with Gallant's assertion that the above statute addresses a payor bank's obligations with regard to a stop pay order; it does not address the rights of a party requesting a stop pay order. Put another way, the statute is simply not relevant in determining whether a party that may have the statutory power to stop payment also has a legal right to do so. Therefore, the trial court erred in basing its decision on IC § 26–1–4–303.

The second basis identified by the trial court in support of its ruling in favor of the Credit Union was that Gallant's stop payment on the settlement check constituted breach of the insurance contract.

As stated previously, the loss provision of the insurance contract stated, in pertinent part, "[h]e company may pay for the loss in money; or may repair or replace the damaged or stolen property; or may, at any time before the loss is paid or the property is so replaced, at its expense return any stolen property to the named insured." *Record* at 176–77. According to this provision, Gallant had a right to repair or replace Blanton's stolen vehicle "at any time before the loss [was] paid." The Credit Union contends that the loss was paid when the settlement check was tendered to the Credit Union. Gallant responds that the loss was not paid because the funds had not yet been deposited in the Credit Union's account. We must determine the meaning of "before the loss is paid" within the meaning of the contract.

 When construing the meaning of an insurance policy provision, we are guided by the following principles:

When the policy language of an insurance contract is clear and unambiguous, it should be given its plain and ordinary meaning. Under Indiana law, an insur-

ance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence. Where there is an ambiguity, an insurance policy must be construed strictly against the insurer. This is particularly true where a policy excludes coverage. The strict construction against the insurer is because the insurer drafts the policy and foists its terms on the potential customer. The customer is faced with deciding whether to accept the insurance contract or forgo insurance coverage.

*Travelers Indemnity Co. v. Summit Corp. of America*, 715 N.E.2d 926, 935 (Ind.Ct. App.1999) (citations omitted).

■ We are called upon to interpret the meaning of the term "paid" in the policy provision set out above. We must first determine whether the language in question is clear or ambiguous.

"Paid" is defined as follows: "[R]eceiving pay ...: marked by the reception of pay esp. in an advance lump sum ...: that has been cashed ....: that has been or will be paid for ...." Webster's Third New International Dictionary 1620 (1976). None of the various definitions set out above cast light on the meaning of "paid" when used in the instant context. Therefore, the term is ambiguous. We must now determine the term's meaning, as used in the insurance contract. In so doing, we must construe the language against Gallant. *See Travelers Indem. Co. v. Summit Corp. of America*, 715 N.E.2d 926.

We turn to Title 9, Article 1 of the Indiana Code, Indiana's Uniform Commercial Code (UCC) provisions, for guidance on the question of whether, when payment is made by check, a debt is paid when the check is tendered to the payee, or at some other subsequent point in time. IC § 26–1–2–511 addresses payment by check, and states as follows:

(1) Unless otherwise agreed, tender of payment is a condition to the seller's duty to tender and complete any delivery.

(2) Tender of payment is sufficient when made by any means or in any manner current in the ordinary course of business, unless the seller demands payment in legal tender and gives any extension of time reasonably necessary to ·procure it.

(3) Subject to the provisions of IC 26–1–3.1–802 on the effect of an instrument on an obligation, payment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment.

Comment 4 to IC § 26–1–2–511 further explains the UCC's view with regard to payment by check:

Subsection (3) is concerned with the rights and obligations as between the parties to a sales transaction when payment is made by check. This Article recognizes that the taking of a seemingly solvent party's check is commercially normal and proper and, if due diligence is exercised in collection, is not to be penalized in any way. The conditional character of the payment under this section refers only to the effect of the transaction "as between the parties" thereto and does not purport to cut into the law of "absolute" and "conditional" payment as applied to such other problems as the discharge of sureties or the responsibilities of a drawee bank which is at the same time an agent for collection.

In *O'Donnell v. American Employers Ins. Co.*, 622 N.E.2d 570 (Ind.Ct.App.1993), this court was called upon to apply the above statutory provisions in the context of an automobile purchase.

In *O'Donnell*, the trial court granted summary judgment in favor of a car dealership and against the occupants of a vehicle who were injured as a result of a collision between the car in which they were riding and a car that had been sold

by the dealership. The plaintiffs argued that the dealership was liable because it still owned the car at the time of the collision because the dealership had not yet received "final payment". *Id.* at 576. This argument, in turn, was premised upon the fact that the collision occurred after the buyer of the car had given the dealership a check to purchase the car, but before the check had been debited to the buyer's account. We were called upon to decide when "final payment" occurred under those circumstances. *Id.*

In support of their argument, the plaintiffs invoked the provisions of IC § 26-1-4-213, which states, in pertinent part: "Upon final payment ... the payor bank shall be accountable for the amount of the item." This court determined that Chapter 4 was not relevant to the issue addressed by the court because Chapter 4 governs bank deposits and collections. We observed that the above provision "merely establishes the point in time when a payor bank has an obligation to pay a check. . . . Thus final payment for a motor vehicle is not determined by that moment under [Chapter] Four when the check is processed and actually paid by the payor bank." *O'Donnell v. American Employers Ins.*, 622 N.E.2d at 576.

The *O'Donnell* analysis of the question of whether final payment occurred when the check was tendered to the dealership or when the buyer's account was debited centered upon IC § 26-1-2-511. We noted that IC § 26-1-2-511 and the comments thereto described the taking of a seemingly solvent party's check as a common commercial practice. It is so common that we characterized it as "commercially normal." *Id.* at 577. In view of this widespread practice, we concluded that "final payment" occurred when the check was tendered to the dealership, and not when it was presented for payment at the buyer's bank. In language equally applicable to the instant case, we concluded:

> Here, the parties have stipulated that payment for the vehicle was made by check. Indeed, the fact that [the dealership] immediately sold the Installment Contract to the Credit Union for cash shows that [the dealership] considered the Installment Contract and the down payment to be final payment for the vehicle. Further, this conclusion is not altered by the fact that payment by check is conditional. If the [buyer]'s checks had been dishonored, [the dealership] would have had full rights to collect on the checks, to sue on the installment contract and to repossess its collateral. Both commercial practice and the policy of our commercial code establish that the [buyers] made final payment for the vehicle.

*O'Donnell v. American Employers Ins. Co.*, 622 N.E.2d at 577.

The instant case parallels *O'Donnell* in several important respects. Both involve a payment made by check, a payment that satisfied an obligation arising under a written contract. Both center upon the question of when such payment became final within the meaning of the contract. We conclude that *O'Donnell* is sufficiently similar to the instant case to serve as precedent for the conclusion that Blanton's loss was "paid" when Gallant tendered the check to Blanton and the Credit Union.

Gallant does not dispute the fact that when it sent the settlement check, it did so to satisfy what at that time was its contractual obligation to pay for the loss of Blanton's stolen car. Blanton and the Credit Union were named as payees on the settlement check. Both endorsed the check and the Credit Union immediately deposited the check in its account. When Gallant issued the settlement check, it asked the Credit Union to send the stolen car's title to Gallant. The Credit Union promptly complied with Gallant's request and Gallant received the title several days before it placed a stop pay order on the settlement check. These facts indicate that the parties considered Blanton's loss to be "paid" at the time the settlement check was tendered to the Credit Union

and Blanton on March 7. Therefore, although Gallant was apparently able to stop payment on the settlement check before the check was debited to Gallant's account,[2] this does not alter the fact that such occurred after the loss was "paid", and thus constituted a breach of the insurance contract. The trial court did not err in entering judgment against Gallant.

2.

Gallant contends that the trial court erred in awarding attorney's fees to the Credit Union. Assuming that the Credit Union was entitled to attorney fees, Gallant also contends that the trial court erred in computing the amount of the award.

▇▇ According to IC § 26–2–7–4, a party is held liable for stopping payment of a check if the party does so "without valid legal cause." IC § 26–2–7–4(1). In *Dishman v. Hill*, 578 N.E.2d 654 (Ind. 1991), our supreme court considered the meaning of the qualifying phrase "without valid legal cause," as used in IC § 28–2–8–1 (repealed 1993), the predecessor to IC § 26–2–7–4. The court concluded that, in order to avoid the statutorily prescribed penalties for stopping payment on a check pursuant to the "without valid legal defense" clause, "the maker must successfully present a recognized legal defense at the trial instituted to collect on the check." *Dishman v. Hill*, 578 N.E.2d at 656. Because Gallant did not prevail in the Credit Union's action to collect on the check, the Credit Union was entitled to damages prescribed by statute.

▇ IC § 26–2–7–5(3) provides that persons who wrongfully stop payment on a check are liable for:

> Reasonable attorney's fees incurred by the holder if the responsibility for collection is referred to an attorney who is not a salaried employee of the holder. If legal action is filed to effect collection and the collection on the check is referred to an attorney who is not a salaried employee of the holder, the holder of the check is entitled to minimum attorney's fees of not less than one hundred dollars ($100).

Because the Credit Union demonstrated the qualifying conditions, *i.e.*, (1) a legal collection action (2) was filed (3) by an attorney (4) who was not a salaried employee of the Credit Union, the trial court did not err in awarding attorney's fees.

▇ With regard to the amount of attorney's fees award, the Credit Union concedes that the award of $7,590.00 is not supported by the record. An affidavit submitted by the Credit Union's counsel reflected a request for attorney's fees in the amount of $3,304.50. We are unable to discern any evidence of record upon which to base an award of fees in excess of the amount requested by the Credit Union. We therefore remand to the trial court with instructions to reduce the award of attorney's fees to the Credit Union from $7,590.00 to $3,304.50.

3.

Gallant contends that the trial court erred in finding that Gallant was liable for the Body Shop's damages. Gallant argues

---

**2.** It would appear that Gallant's bank did not comply with the time constraints placed upon payor banks by IC § 26–1–4–302. According to that provision, by midnight of the banking day of receipt, a payor bank must pay, return, or send notice of dishonor with respect to items presented to the payor bank. Although the time limitation imposed in IC § 26–1–4–302 is subject to certain delineated exceptions, the record does not reflect that such an exceptional circumstance existed. Indeed,

the payor bank's delay in acting upon the check presented by the Credit Union is not discussed by the parties. We presume, however, that the trial court's ruling that Gallant was in violation of IC § 26–1–4–303 with regard to the stop pay order reflects its conclusion that the March 14 stop pay order came after the time had expired for the payor bank to act, in view of the fact that the check was presented on March 11.

that the Credit Union, not Gallant, should be held liable for those costs.

Gallant does not dispute the fact that it authorized the Body Shop to repair Blanton's auto. In fact, Gallant paid for those repairs, minus a $500 deductible, which it contended that Blanton owed pursuant to the insurance contract. Therefore, Gallant's objections with regard to the damages awarded to the Body Shop center upon the deductible, the storage fees, and attorney's fees. Gallant's arguments in this regard are dependent upon the outcome of the first issue addressed herein. That is, in order to prevail in the argument that it was not liable to the Body Shop, Gallant must successfully argue that the stop pay order was legally correct and therefore Gallant was not liable to the Credit Union.[3] Having determined that Gallant wrongfully stopped payment on the check and was therefore liable to the Credit Union as set out above, we reject the derivative contention that the trial court erred in entering judgment against Gallant and in favor of the Body Shop.

Judgment affirmed in part, reversed in part, and remanded with instructions.

GARRARD, Sr.J., concurs.

DARDEN, J., concurs in part and dissents in part with separate opinion.

DARDEN, Judge, concurring in part and dissenting in part

I concur in part and respectfully dissent in part.

I agree with the majority's conclusion that the trial court did not err in holding Gallant liable for wrongfully stopping payment on the settlement check, and the awarding of reasonable attorney's fees to the Credit Union.

However, I cannot agree with the trial court's conclusion that Gallant was liable for all of the Body Shop's damages. Two

years earlier, the Credit Union had sought and obtained an injunction whereby the Body Shop was unable to pursue its statutory remedy of a mechanic's lien. See IND.CODE § 9–22–5–15. An injunction is an equitable remedy. See *Schlehuser v. City of Seymour,* 674 N.E.2d 1009, 1012 (Ind.Ct.App.1996); *Bagko Development Co. v. Damitz,* 640 N.E.2d 67, 70 (Ind.Ct. App.1994). As an "extraordinary" equitable remedy, an injunction "should be granted with great caution and only used sparingly." *Ed Bertholet & Assoc., Inc. v. Stefanko,* 690 N.E.2d 361, 363 (Ind.Ct.App. 1998). Furthermore, injunctions are rarely granted when the movant has an adequate remedy at law. *See, e.g., McKain v. Rigsby,* 250 Ind. 438, 237 N.E.2d 99, 103 (1968); *City of Muncie v. Pizza Hut of Muncie, Inc.,* 171 Ind.App. 397, 357 N.E.2d 735, 737 (1976). A legal remedy is adequate where it is "as 'plain, complete and adequate – or in other words, as practical and efficient to the ends of justice and its prompt administration – as the remedy in equity.'" *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power er Assoc., Inc.,* 692 N.E.2d 905, 909 (Ind. Ct.App.1998), *trans. denied* (quoting *McKain,* 237 N.E.2d at 103).

Contrary to the mandate of Ind. Trial Rule 65(A), no hearing was held, and the order was issued the same day the Credit Union filed its request. Further, contrary to the express requirement of Ind. Trial Rule 65(C), no security was ordered. T.R. 65(C) requires, "as a prerequisite to the issuance" of a preliminary injunction, "giving of security by the applicant in such sum as the court deems proper for the payment of costs and damages which may be incurred by a party found to have been wrongfully enjoined." WILLIAM F. HARVEY, INDIANA PRACTICE § 65.6 (1991). Such a requirement exists because a preliminary injunction does not require "a full hearing" on the facts of the case, thus presenting

---

**3.** In view of the fact that the Body Shop repaired the car at Gallant's direction, and stored the car as a result of a stay issued by

the trial court, we summarily reject Gallant's argument that the Body Shop failed to mitigate its damages.

the likelihood that an injunction may be wrongfully issued. *National Sanitary Supply Co. v. Wright*, 644 N.E.2d 903, 905 (Ind.Ct.App.1994), *trans. denied.*

Had the Body Shop been able to pursue its statutory remedy, it could have sold the almost new car, and it likely would have recovered in excess of the $500 repair charge and $20 daily storage charges from April 1996, when Gallant had the car delivered, until fall of 1996. Instead, from the time of the injunction on August 8, 1996 until the October 26, 1998 court order, storage charges accrued and added about $15,000 in additional damages to those suffered by the Body Shop.

The trial court held that because Gallant delivered the car to the Body Shop and the Credit Union had never requested the Body Shop to take possession of or repair the vehicle, Gallant was liable for all the Body Shop's damages. Such reasoning fails to acknowledge the corollary, undisputed fact that the Body Shop's damages after August 8, 1996, accrued solely because the Body Shop could not pursue its statutory sale remedy because the Credit Union obtained an injunction preventing the Body Shop from doing so. For this reason, the damages award here seems to me to turn equity "on its head." Gallant may be responsible for the Body Shop's damages in the amount of the $500 repair bill and storage charges until August 8, 1996. However, I find it utterly inequitable to hold it responsible for the damages subsequently incurred. When the Credit Union—not Gallant—sought the preliminary injunction, it asserted to the trial court that the Body Shop was "unlawfully holding" the car. (R. 18). The trial court's judgment did not find this to be so.

Moreover, it is undisputed that the injury claimed by the Credit Union in its action against Gallant was purely economic in nature. Therefore, we have a dispute between two solvent financial institutions wherein monetary damages would afford either a legal remedy that would be as plain, complete and adequate, or in other words, as practical and efficient to the ends of justice and its prompt administration as the equitable remedy. *See Jay County*, 692 N.E.2d at 909. Accordingly, I believe that the trial court abused its equitable discretion in issuing the injunction.

I would hold the Credit Union responsible for the storage charges accruing after the issuance of the injunction inasmuch as such would be the damages properly considered upon the Body Shop's having been wrongfully enjoined at the Credit Union's behest.