NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, et al, Appellants–Defendants,

v.

STANDARD FUSEE CORPORATION, Appellee–Plaintiff.

No. 49A04–0811–CV–665.

Court of Appeals of Indiana.

Dec. 3, 2009.

Rehearing Denied Feb. 5, 2010.

---

5. Many of these facts were not mentioned in the motion to dismiss.

Charles Browning, Jeffrey C. Gerish, Plunkett Cooney, Bloomfield Hills, MI, Jeffrey B. Fecht, Riley Bennett & Egloff, LLP, Indianapolis, IN, Attorneys for Chubb Custom Insurance Company and Travelers Indemnity Company of Illinois.

Bruce L. Kamplain, Norris Choplin & Schroeder, LLP, Indianapolis, IN, Attorney for Evanston Insurance Company and Westchester Fire Insurance Company, assuming reinsurer of Freemont Indemnity Company (successor to Industrial Indemnity Company).

Karen W. Howard, Colliau Elenius Murphy Carluccio Keener, & Morrow Chicago, IL, Martha S. Hollingsworth, Bingham McHale, LLP, Indianapolis, IN, Attorneys for The Continental Insurance Company.

Ed Harney, Jr., Hume Smith Geddes Green & Simmons, LLP, Indianapolis, IN, Attorney for GAN North American Insurance Company.

David W. Walulik, Frost Brown Todd, LLC, Cincinnati, OH, Douglas W. Langdon, Frost Brown Todd, LLC, New Albany, IN, Attorneys for Great American Excess and Surplus Insurance Company.

Barbara A. Jones, Dennis F. Cantrell, Cantrell, Strenski & Mehringer, LLP, Indianapolis, IN, Attorneys for Liberty Insurance Underwriters, Inc.

Mark W. Zimmerman, Colleen A. Brown, Clausen Miller, PC, Chicago, IL, Patricia Polis McCrory, Carrie G. Doehrmann, Frost Brown Todd, LLP, Indianapolis, IN, Attorneys for National Union Fire Insurance Company of Pittsburgh, Pa.; Lexington Insurance Company.

Jeffrey D. Claflin, Thao T. Nguyen, Plews Shadley Racher & Braun, South Bend, IN, Gregory M. Gotwald, Katherine E. Taylor, Theresa M. Willard, Plews Shadley Racher & Braun, Indianapolis, IN, Attorneys for Appellee.

## OPINION[1]

KIRSCH, Judge.

Defendants, Chubb Custom Insurance Company, Travelers Indemnity Company of Illinois, Evanston Insurance Company, The Continental Insurance Company, GAN North American Insurance Company, Great American Excess and Surplus Insurance Company, Liberty Insurance Underwriters, Inc., Westchester Fire Insurance Company, National Union Fire Insurance Co. of Pittsburgh, Pennsylvania, and Lexington Insurance Company (collectively "the Insurers"), appeal from the trial court's order granting Standard Fusee Corporation's ("SFC") Motion for Partial Summary Judgment Declaring [the Insur-

---

1. Oral argument was heard on this case on July 21, 2009 in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

ers'] Duty to Defend. The following restated issues are raised in this appeal:

I. Whether the trial court erred by concluding that Indiana substantive law, instead of Maryland substantive law, applied to the dispute;

II. Whether the trial court erred by concluding that SFC provided the Insurers with reasonable notice of environmental proceedings in Indiana and California;

III. Whether the trial court erred by concluding that the pollution exclusions in the Insurers' insurance policies do not relieve the Insurers of their duty to defend SFC;

IV. Whether the trial court erred in concluding that SFC's entry into Indiana's Voluntary Remediation Program[2] ("VRP") constitutes a "suit" for purposes of the insurance policies;

V. Whether the trial court erred by concluding that the Insurers had a duty to defend against all of the more than 250 private lawsuits in California when SFC submitted just two of the complaints in support of its motion for summary judgment.

We affirm in part, and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

SFC is a manufacturer of emergency signaling devices, including highway, railway, and marine flares. SFC is a Delaware corporation with its headquarters in Easton, Maryland. When it incorporated in 1988, SFC owned a facility in Easton ("the Maryland site"), two in Pennsylvania, one in New Jersey, and another in Ohio. The same year, SFC began leasing flare-making facilities in Peru, Indiana ("the Indiana site"), and Morgan Hill, California ("the California site"), from Olin Corporation ("Olin"). Also the same year, SFC sold the Pennsylvania and Ohio sites. In 1992, SFC purchased another facility in Pennsylvania. In 1995, SFC ceased operations at the California site. From 1995 to 2002, SFC owned and operated a facility in Illinois. Finally, in 1997, SFC purchased the Indiana site from Olin. Today, SFC has operations at the Maryland site, the Indiana site, and the facility in Pennsylvania.[3]

SFC used at least two insurance brokers, one located in Maryland, and another located in Massachusetts, to obtain its insurance policies. Those brokers met with SFC's President and Chief Financial Officer at SFC's Maryland headquarters several times a year to discuss, *inter alia,* policies, potential additional coverage, and states of operation. Once the policies were bound, they were delivered and retained in SFC's Maryland headquarters, and all premiums were paid from SFC's Maryland headquarters.

In 2002, Olin sent a letter informing SFC that perchlorate,[4] a chemical which is

---

2. *See* Ind.Code § 13–25–5 *et seq.*

3. The parties do not tell us the fate of SFC's New Jersey facility.

4. In its Complaint, SFC noted that a chemical used by SFC in the manufacture of signal flares is potassium perchlorate, and that SFC discovered possible perchlorate contamination at the Indiana site. *See Appellants' App.* at 3385. As a result of perchlorate contamination in California, the California Regional Water Quality Control Board issued clean-up and abatement orders to Olin and SFC demanding, in part, an updated groundwater monitoring plan and provision of drinking water to affected property owners. *Id.* at 3386.

used in the production of flares, had been discovered in water samples at and around the California site. Beginning in 2003, more than 250 private lawsuits were filed against SFC with regard to the California site. It was eventually determined that SFC had never discharged perchlorate at the site, so almost all of the suits against SFC were dismissed.[5] SFC is not subject to present or future abatement orders to clean or remediate the California site.

In 2004, SFC performed a voluntary screening inspection of the Indiana site. The inspection suggested potential perchlorate contamination. In October 2005, SFC applied for inclusion in the Indiana Department of Environmental Management's ("IDEM") VRP.

As a result of the legal proceedings in California and Indiana, SFC incurred certain defense costs and faces the prospect of future environmental liability. As such, SFC requested defense and indemnification from the Insurers. The Insurers "either disputed their defense and indemnity obligations to [SFC]" or "otherwise failed to respond to [SFC's] request[s] for defense and indemnification." *Appellants' App.* at 88.

On December 19, 2005, SFC filed a Complaint against the Insurers seeking "a judgment declaring that [the Insurers] must defend and indemnify [SFC] under comprehensive general liability ('CGL') primary, excess, or umbrella insurance polic[ies] against certain environmental liabilities arising from [SFC's] operations at [the Indiana site] and [the California site]." *Id.* at 84. SFC also sought "damages arising from [the Insurers'] failure to defend

and indemni[f]y it against these liabilities." *Id.*

On October 13, 2006, SFC filed a Motion for Partial Summary Judgment Declaring [Insurers'] Duty to Defend. *Id.* at 380. On October 9, 2007, one of the Insurers, Chubb Custom Insurance Company ("Chubb"), filed its own motion for summary judgment on the issue of its duty to defend. All other Insurers joined Chubb's motion, and several filed their own motions. On April 28, 2008, the trial court held a hearing on the opposing motions. On July 9, 2008, the trial court issued an order granting SFC's motion for partial summary judgment and declaring that the Insurers have a duty to defend SFC.[6] The trial court concluded, in part, that Indiana substantive law, rather than Maryland substantive law, governs this case. The Insurers sought an interlocutory appeal of the trial court's order. On October 16, 2008, the trial court certified its order for interlocutory appeal, and on December 24, 2008, we accepted jurisdiction of the appeal. The Insurers now appeal.

## DISCUSSION AND DECISION

### Standard of Review

Our standard of review for summary judgment is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Bd. of Sch. Comm'rs of City of Indianapolis v. Pettigrew*, 851 N.E.2d 326, 330 (Ind.Ct.App.2006). All facts and reasonable inferences drawn from those facts

---

**5.** In its Complaint, SFC alleged that three of the suits against it relating to the California site "continue[d]." *Appellants' App.* at 86.

**6.** On August 11, 2008, the trial court issued an order to clarify that it was granting, in part, the motion for summary judgment filed by one of the Insurers, National Union Fire Insurance Company of Pittsburgh, Pennsylvania. SFC does not challenge that ruling on appeal.

are construed in favor of the non-moving party. *Pettigrew,* 851 N.E.2d at 330. Review of a summary judgment motion is limited to those materials designated to the trial court. *Id.*

## I. Choice of Law

■■ The Insurers first argue that the trial court should have applied Maryland substantive law instead of Indiana substantive law. When faced with a choice of law question, the decision is made by the courts of the state in which the suit is pending. *Schaffert by Schaffert v. Jackson Nat'l Life Ins. Co.,* 687 N.E.2d 230, 232 (Ind.Ct.App.1997), *trans. denied.* Of course, a choice of law analysis is only necessary if there is a conflict between the laws of the states in question. *Am. Employers Ins. v. Coachmen Indus.,* 838 N.E.2d 1172, 1176 (Ind.Ct.App.2005). Here, the trial court concluded that "there is a substantial conflict between the laws of the State of Maryland and the laws of the State of Indiana relating to the interpretation of insurance policies in general and the pollution exclusion in particular." *Appellants'* Br. at 81. The parties do not dispute this conclusion.

Since 1978, this court has generally followed the Restatement (Second) of Conflict of Laws (1971) ("Restatement") when confronted with a choice of law issue. *See Utopia Coach Corp. v. Weatherwax,* 177 Ind.App. 321, 379 N.E.2d 518 (1978). Restatement Section 6 lists several factors to be considered by any court faced with a choice of law issue:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

The Restatement offers specific guidance for courts addressing choice of law questions in contract actions. Under Section 188, "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." In determining the state that has the most significant relationship to the transaction and the parties under the principles stated in Section 6, the contacts to be taken into account include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Id.*

■ The Restatement is even more specific with regard to contracts for fire, surety, or casualty (including liability) insurance. In fact, Section 193 has been described as addressing "that special subset of contracts that involves insurance." *Zurich Ins. v. Shearson Lehman Hutton,* 84 N.Y.2d 309, 318, 642 N.E.2d 1065, 1069, 618 N.Y.S.2d 609, 613 (1994). Section 193 provides:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local

law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

"An insured risk, namely the object or activity which is the subject matter of the insurance, has its principal location, in the sense used here, in the state where it will be during at least the major portion of the insurance period." Restatement § 193, cmt. *b*. In some cases, the principal location of the insured risk can be determined; in others, it cannot; and in some cases, there are multiple risks to be considered. The Restatement contemplates all three situations.

"In the great majority of instances, the term of a contract of fire, surety or casualty insurance will be relatively brief, and it will usually be possible to predict with fair accuracy where the risk will be located, or at least principally located, during the life of the policy." *Id.* "This will obviously be so when the insurance covers an immovable object, such as a house[.]" *Id.* "This will also usually be so when the subject of the insurance is a chattel, since the parties will usually know beforehand where the chattel will be located during the major portion of the insurance period." *Id.* For example, the parties to an automobile liability policy will usually know beforehand where the automobile will be garaged at least during most of the period in question. *Id.* "The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." *Id.*

When, on the other hand, insurance covers things that are constantly on the move from state to state, such as ships, trucks, airplanes, and railroad cars, there may be no principal location of the insured risk. *Id.* at cmt. *a*. In such cases, the location of the risk can play little role in the determination of the applicable law. *Id.* The law governing insurance contracts of this sort must be determined in accordance with the general principles set forth in Section 188. *Id.*

Another situation in which it is not possible to identify a single state as "the principal location of the insured risk" is "where the policy covers a group of risks that are scattered throughout two or more states." Restatement § 193, cmt. *b*. Comment *a* to Section 193 states, "As to multiple risk policies, see Comment/" To address the "special problem ... presented by multiple risk policies which insure against risks located in several states," Comment *f* uses the example of a single policy insuring dwelling houses located in states X, Y, and Z. "Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk." Restatement § 193, cmt. *f* "So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X." *Id.* Under this site-specific approach, it is possible that more than one body of law will apply to a single insurance contract. *See Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n Ins. Co.,* 134 N.J. 96, 629 A.2d 885, 890 (1993).

While this court has applied Section 188 to choice of law questions in contract actions since 1978, *see Weatherwax,* 177 Ind. App. 321, 379 N.E.2d 518, we have never

adopted the site-specific approach of Comment *f* in cases of multiple risk policies. To the contrary, we have generally followed the "uniform-contract-interpretation approach," under which "the law of a single forum governs the interpretation of coverage under a casualty-insurance policy for multi-state claims arising from environmental damage in multiple jurisdictions." *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 293 (Ind.Ct.App. 1997), *trans. denied.* Following this approach, we have held in several cases that, where there are sites in multiple states, the state with the most sites is "the principal location of the insured risk" for purposes of Section 193. *See Am. Employers Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E.2d 1172, 1181 (Ind.Ct.App.2005); *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1025 (Ind.Ct.App. 1999), *reh'g denied, trans. denied; Travelers Indem. Co. v. Summit Corp. of* America, 715 N.E.2d 926, 933 (Ind.Ct.App.1999); and *Dana Corp.*, 690 N.E.2d at 294. It is important to note that the *Dana Corp.* court did not explicitly reject the site-specific approach of Comment *f* in favor of the uniform-contract-interpretation approach. Rather, both parties asked us to follow the uniform-contract-interpretation approach, and that is what we did. *Dana Corp.*, 690 N.E.2d at 293–94. Then, in *Coachmen*, another panel of this court cited *Dana Corp.* for the proposition that "Indiana follows the uniform-contract-interpretation approach' when confronted with comprehensive general liability coverage of multi-state claims." 838 N.E.2d at 1181. However, we conclude that, with regard to policies covering risks in multiple states, following the uniform-contract-interpretation approach is contrary to the general principles listed in Section 6 and the rationale behind Section 193.

We agree with the supreme court of Connecticut that Section 193 creates a rebuttable presumption in favor of the state where the insured risk is located. *See Reichhold Chemls., Inc. v. Hartford Accident and Indem. Co.*, et al., 252 Conn. 774, 750 A.2d 1051, 1056 (2000). The presumption may be overcome if another state's interest is sufficiently compelling as to outweigh those interests of the state where the insured risk is located, thus leading to a Section 6 analysis. *Id.*

As we see it, two of the most important and measurable considerations listed in Section 6 are "(f) certainty, predictability and uniformity of result" and "(g) ease in the determination and application of the law to be applied." When the uniform-contract-interpretation approach is applied to a policy covering risks in multiple states, the court is left to choose a single state based on the general factors listed in Section 188. As shown by our case law, this is rarely an easy determination, and the parties can only speculate as to which state's law will apply. In such a situation, it is impossible for an insurer to quantify its risk and for an insured to even know whether a particular risk is covered. Under the site-specific approach, on the other hand, the parties know in advance which law will apply, the insurer can quantify its risk, the insured will know that it has coverage, and the court need not concern itself with the Section 188 factors in order to choose a single state's law.

Another Section 6 consideration is "(d) the protection of justified expectations." Under a uniform-contract interpretation approach to insurance policies covering risks located in more than one state and lacking a choice of law provision, this is impossible. Until the law that will apply to the policy is determined, neither the insured, nor the insurer, can have such protection. To the extent that the site-specific approach leads to the application of more than one body of law to a single

contract, it cannot be said that the justified expectations of the parties have been thwarted. "If the parties to an insurance contract truly prize uniform interpretation of multistate insurance policy language, they can frequently achieve it by expressing a choice of law in the contract." *Gilbert Spruance*, 603 A.2d at 64. "Their failure to express such a choice tends to show that uniform interpretation was not a conscious goal of the contracting parties." *Id.* at 64–65.

The uniform-contract-interpretation approach is also inconsistent with the rationale behind Section 193. Comment *c* to Section 193 provides:

> *c. Rationale.* A number of reasons serve to explain why such importance is attached to the principal location of the insured risk. This location has an intimate bearing upon the risk's nature and extent and is a factor upon which the terms and conditions of the policy will frequently depend. So the cost of automobile liability or of collision insurance will probably be higher if the place where the automobile will be principally garaged during the term of the policy is an urban, as opposed to rural, community. Similarly, the cost of fire insurance will depend in part upon the place where the insured thing is located. For these and other reasons, the location of the risk is a matter of intense concern to the parties to the insurance contract. And it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract. *Likewise, the state where the insured risk will be principally located during the term of the policy has a natural interest in the determination of issues arising under the insurance contract.*

(Emphasis added). To follow the uniform-contract-interpretation approach and apply the law of a single state to a dispute involving several states is to minimize the natural interests of the other states in the determination of the issues arising under the insurance contract.

We acknowledge that application of the site-specific approach could result in the same policy language meaning fifty different things in fifty different states. But we agree with the New Jersey Appellate Division that this cost is outweighed by "the significant governmental interest of the various jurisdictions where the insured risks are located, or where the insured entity predictably is going to incur legal liabilities." *Johnson Matthey Inc. v. Pennsylvania Mfrs' Ass'n Ins. Co.*, 250 N.J.Super. 51, 593 A.2d 367, 371 (1991). This interest includes protecting the health and safety of the state's people by ensuring that environmental contamination is cleaned up. *See id.* at 370–71. Because funding for such cleanup is a key concern, a state where pollution occurs has a significant interest in the outcome of an insurance coverage dispute. *Id.* We believe that the insurance coverage implications here are of enormous concern to the people of Indiana, who have an intense interest in their rights as property owners and in the protection of their environment. "A corollary to [a state's] compelling interest in the remediation of hazardous waste sites is its interest in the availability of insurance coverage for the costs associated with the cleanup of those sites." *See Leksi, Inc. v. Fed. Ins. Co.*, 736 F.Supp. 1331, 1335 (D.N.J.1990) (citing *Cont'l Ins. Cos. v. Ne. Pharm. & Chem. Co., Inc.*, 842 F.2d 977, 985 (8th Cir.) (en banc)).

In *Aetna Casualty & Surety Company v. Dow Chemical Co.*, 883 F.Supp. 1101 (E.D.Mich.1995), the federal district court

for the eastern district of Michigan rejected the site-specific approach to choice of law determinations in multi-state, multi-site insurance coverage disputes. The court analyzed Section 193, but supported its uniform-contract-interpretation approach by finding that the policy behind the Restatement was a preference that only one set of laws governs an insurance contract. 883 F.Supp. at 1106. *The Aetna* court distinguished cases finding that application of the site-specific approach was appropriate, deeming those cases unpersuasive because "section 193 does not provide that the location of the risk is a key factor where there is no *principal* location of the risk." *Id.* (emphasis in original). The court claimed to find support in language from section 193, comment a, reading it to provide that "[w]hen there is no principal location of a risk, the location of the risk has little influence over which law should apply," preferring instead a Section 188 and Section 6 analysis when a group of risks is scattered throughout two or more states. 883 F.Supp. at 1107.

We think that Comment *a* of Section 193 reads differently. As quoted above, Comment *a* explains that "[t]here may be no principal location of the insured risk in the case of contracts for the insurance of things, such as ships, trucks, airplanes, and railroad cars, that are *constantly on the move* from state to state. In such a case, the location of the risk can play little role in the determination of the applicable law." (emphasis supplied). Here, the principal locations of the insured risks are immovable and readily identifiable.

We further disagree with the *Aetna* court's criticism of the site-specific approach as producing "anomalous results in conflict with the expectations of the parties and the commercial world." *Aetna,* 883 F.Supp. at 1108. There are situations, such as the one here, involving the purchase of insurance coverage under one policy for multiple sites in multiple states with each site being a principal location. How does an insurer quantify its risk with any predictability if it does not know what law applies to the risk? How is that risk to be measured? How does an insured make an informed business decision about what insurance coverage it is buying and what premiums it is willing to pay for that coverage? Because real estate does not move, the principal location of the risks in the various states is easily determined, thus satisfying the considerations of the § 6 factors "(f) certainty, predictability and uniformity of result" and "(g) ease in the determination and application of the law to be applied." Moreover, it protects the justified expectations of the parties, another § 6 consideration. Restatement § 6(d). By employing the site-specific approach, the insured may adjust its premiums to reflect its exposure under the laws of the state where the risk is located.

Consider the example of two sets of insurers and insureds negotiating a CGL policy covering risks in Indiana and California. Set One has separate, but identical, policies issued covering the separate risks. Set Two has a single policy, identical to the policy in Set One, covering the risks. In Set One, there is no question that the policies would be separately construed under the laws of the separate states. Why should the policy in Set Two be treated any differently, especially in light of the guidance provided in Section 193, comment *f* which suggests treating the single policy as separate policies subject to different laws?

█ Indiana has a long-standing policy of construing ambiguities in insurance contracts against the insurer. *See Dana Corp.,* 690 N.E.2d at 291 (ambiguous insurance policies strictly construed against insurer). Here, the Insurers could have in-

cluded a choice of law provision in their contract, but failed to do so. "[T]he allocation of clean-up costs is fundamental to any state's environmental policy." *Leksi,* 736 F.Supp. at 1334 (quoting *Sandvik, Inc. v. Cont'l Ins. Co.,* 724 F.Supp. 303, 311 (D.N.J.1989)). Choice of law issues should be resolved accordingly. "Resolution of the [choice of laws] issue turns on how [the dispute] is characterized; it can be viewed either as a dispute between private parties over the interpretation of a private contract, or as a dispute over insurance coverage in relation to environmental enforcement actions." *Leksi,* 736 F.Supp. at 1333. We agree with the *Leksi* court's observation that "[i]f there are no funds to satisfy the costs incurred in the cleanup of hazardous waste sites, the entire [environmental] statutory framework would, in some cases, become a right without a remedy." *Id.* at 1335.

■ Turning to the present case, Indiana has the most significant relationship to this transaction and the parties regarding the Indiana site. Those sites have an effect on the health and environmental well-being of this State's inhabitants. The State bears the brunt of the cleanup costs if the insured fails to remediate the site. Indiana's public policies in favor of coverage and construing policies of insurance in favor of the insured are impacted. *See Dana Corp.,* 690 N.E.2d at 291 (ambiguous insurance policies strictly construed against insurer); *General Cas. Ins. Co. v. Bright,* 885 N.E.2d 56, 58 (Ind. Ct.App.2008) (view ambiguous policy language from standpoint of insured to further general purpose of insurance contract to provide coverage). Maryland and California have no interest in the remediation of Indiana's site.

As noted above, the premiums were paid in Maryland, the policies were delivered and retained in SFC's Maryland headquarters, one of the brokers used was based in Maryland, and the brokers met SFC's President in Maryland at the SFC headquarters. Yet Maryland's interest in Indiana's site is not as significant as Indiana's interest, especially if that interest is characterized in terms of a dispute over insurance coverage in relation to environmental enforcement actions. "A phone call, a signature, the typing and mailing of a preprinted insurance policy, the issuance and deposit of a premium check do not add up to significant ... roots." *Johnson Matthey,* 250 N.J.Super. at 59–60, 593 A.2d at 372. Maryland most certainly has an interest in the Maryland site, and Maryland law should apply there. Likewise, California has an interest in the California site, and California law should apply there.

■ Following the site-specific approach in this case leads us to the conclusion that the litigation over the Indiana site should be resolved under Indiana substantive law, while the litigation over the California site should be resolved under California substantive law. Accordingly, the trial court did not err to the extent it applied Indiana substantive law to the Indiana site. Therefore, we address the other issues raised by the Insurers as they relate to the Indiana site. However, to the extent that the issues raised by the Insurers relate to the California site, we remand to the trial court with instructions for it to apply California law.

## II. Reasonable Notice

■ The Insurers argue that the trial court erred by concluding that SFC provided the Insurers with reasonable notice of the environmental proceedings in Indiana and California. In support of its motion for summary judgment, SFC designated the affidavit of Ranelle Leier, a partner with a law firm that has represented SFC since 1991. Leier indicated that she

has assisted with overseeing SFC's litigation and threats of litigation arising from SFC's environmental liabilities in California and Indiana. Leier averred that her affidavit was based upon personal knowledge, but the Insurers moved to strike Leier's affidavit claiming that it was not. The Insurers further argued that absent Leier's affidavit there would be no evidence that SFC complied with the notice provisions of the policies, thus relieving the Insurers of their duty to defend and indemnify SFC.

In ruling on the motion to strike, the trial court found that Leier's affidavit testimony contained both procedural aspects of her representation and her version of the facts and opinions regarding that representation. The trial court granted that motion in part excluding Leier's affidavit testimony based upon facts supplied to her by her client. The trial court allowed the admission of Leier's affidavit testimony pertaining to procedural aspects of her representation of SFC to the situations in which she personally represented SFC, as that would be based on personal knowledge. The trial court concluded that since Leier's affidavit was struck in part and admitted in part, the Insurers argument based on notice "falls aside." *Appellants' Br.* at 92.

The Insurers assert that the trial court erred by failing to strike Leier's affidavit *in toto*. In particular, the Insurers challenge Leier's statement that SFC "notified its liability insurers concerning both [the California site] actions and the action at [the Indiana site] and, consistent with the terms of its CGL policies, demanded defense and indemnity against those actions." *Appellants 'App.* at 412. The Insurers argue that Leier failed to attach the notice documentation to her affidavit, therefore rendering the affidavit conclusory and deficient under the Indiana trial rules.

The trial court has broad discretion in ruling on the admissibility of evidence. *Price v. Freeland,* 832 N.E.2d 1036, 1039 (Ind.Ct.App.2005). "This discretion extends to rulings on motions to strike affidavits on the grounds that they fail to comply with the summary judgment rules." *Id.* Affidavits in support of or in opposition to a motion for summary judgment are governed by Indiana Trial Rule 56(E), which provides in relevant part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "The requirements of T.R. 56(E) are mandatory; hence, a court considering a motion for summary judgment should disregard inadmissible information contained in supporting or opposing affidavits." *City of Gary v. McCrady,* 851 N.E.2d 359, 363 (Ind.Ct. App.2006). Furthermore, "[s]worn or certified copies not previously self-authenticated of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." T.R. 56(E).

Here, we can infer Leier's knowledge and competence from the affidavit. *See American Mgmt., Inc. v. MIF Realty, L.P.,* 666 N.E.2d 424, 429 n. 1 (Ind.Ct.App. 1996) (knowledge and competence of affiant inferred from affidavit). Leier's affidavit indicates that Leier is a partner with a law firm that has represented SFC since 1991, and Leier has assisted with overseeing SFC's litigation and threats of litigation arising from SFC's environmental liabilities in California and Indiana. Leier's personal knowledge is further supported in the designated materials by her deposition testimony regarding her recollection of the dates that notice was sent to the Insurers. *Appellants' App.* at 947.

The Insurers argue that Leier's affidavit refers to having sent notice to the Insurers, yet no copies of the purported notices were attached to the affidavit. On December 21, 2007, SFC supplemented its designation of materials, and designated materials in opposition to cross-motions for summary judgment. *Appellants' App.* at 4374. In that supplementation, SFC designated "[a]ny and all materials designated by [the Insurers] either in opposition to [SFC's] duty-to-defend motion or in support of their cross-motions on the duty to defend." *Id.* Among the materials submitted by one of the Insurers, Steadfast Insurance Company ("Steadfast"), in opposition to SFC's motion for partial-summary judgment on the duty to defend, is the affidavit of Kathleen Lavallie, a claims specialist with the Zurich group of companies, to which Steadfast is affiliated. *Id.* at 2512. Attached to Lavallie's affidavit is a copy of the notice sent by the president of SFC to Steadfast, which included a list of the lawsuits arising from the California site, indicating that the matter was scheduled for mediation during which SFC might resolve its liability regarding the California and Indiana sites, and tendering its demand for defense and indemnity against the actions. *Id.* 2557.

■ Indiana Trial Rule 56(C) provides that "at the time of filing the motion or response," a party shall designate all evidence upon which it relies. *AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc.,* 816 N.E.2d 40, 47 (Ind.Ct.App.2004). Moreover, "[o]nce evidence has been designated to the trial court by one party, the evidence is deemed designated and the opposing party need not designate the same evidence." *Id.* at 46. The notice letter to Steadfast was designated by Steadfast in its opposition to SFC's motion for summary judgment, and SFC designated "any and all materials designated by [the Insurers]." *Appellants' App.* at 4374.

While notice would have been more easily established had copies been attached to the affidavit, for purposes of summary judgment, there was competent evidence that notice was given. No contradictory evidence alleging no notice, or unreasonably late notice, was designated. Consequently, the Insurers' argument that there is no competent evidence concerning when SFC first learned of contamination at the California or Indiana sites so as to permit an evaluation of the timeliness of the notice fails, and we find that the trial court did not err in concluding that the Insurers were not relieved of their duty to defend SFC on that ground.

### III. Pollution Exclusions

■ The Insurers argue that the trial court erred by concluding that the pollution exclusions in the Insurers' insurance policies do not relieve the Insurers of their duty to defend SFC. More specifically, the Insurers argue that the trial court erred by finding that, under Indiana substantive law, the pollution exclusions contained in the policies were ambiguous and unenforceable. The Insurers argue that *American States Ins. Co. v. Kiger,* 662 N.E.2d 945 (Ind.1996), relied upon by the trial court, is factually distinguishable, and that the trial court erred by relying upon that case in concluding that the Insurers have a duty to defend SFC.

All of the policies issued to SFC contained pollution exclusions, which provided in pertinent part:

A. This insurance does not apply to bodily injury, property damage, advertising injury, or personal injury arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants:

1. at or from any premises, site or location which is or was at one time owned or occupied by, or rented or loaned to, any insured;

\* \* \*

4. at or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

B. This insurance does not apply to any loss, cost or expense arising out of any

1. request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

2. claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing or in any way responding to, or assessing the effects of pollutants.

\* \* \*

DEFINITIONS WHEN USED WITH RESPECT TO INSURANCE UNDER THIS CONTRACT:

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Appellants' App.* at 2955. The trial court correctly found that this exclusion is identical to the pollution exclusion in *Kiger* which our Supreme Court found "cannot be read literally as it would negate virtual-

ly all coverage" and, thus, required interpretation. 662 N.E.2d at 948.

"[W]here the policy language is ambiguous, insurance contracts are to be construed strictly against the insurer." *Cinergy Corp. v. Associated Elec. & Gas Ins. Services, Ltd.,* 865 N.E.2d 571, 574 (Ind.2007). This is particularly true where a policy excludes coverage. *Kiger,* 662 N.E.2d at 947. We view the policy language from the standpoint of the insured to further the general purpose of the insurance contract to provide coverage. *General Cas. Ins. Co.,* 885 N.E.2d at 58. "The insurance companies write the policies; we buy their forms or we do not buy insurance." *American Econ. Ins. Co. v. Liggett,* 426 N.E.2d 136, 142 (Ind.Ct.App. 1981).

The Insurers argue that the type of policyholder and type of pollutant involved distinguishes the present situation factually from *Kiger.* The trial court rejected this argument, and we do as well.

First, the Insurers try to distinguish *Kiger* by arguing that the insureds in *Kiger* were "a mom and pop gas station" and less sophisticated policyholders in comparison to SFC. *Appellants'* Br. at 45. We agree with the trial court's conclusion that Indiana law does not recognize a distinction in the level of a policyholder's sophistication. "Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence." *Travelers Indem. Co.,* 715 N.E.2d at 936. Consequently, the Insurers' argument about whether SFC was a sophisticated policyholder need not be decided.

Next, the Insurers try to limit *Kiger's* holding to the type of pollutant involved. In *Kiger,* the alleged pollutant was gasoline, a key segment of the gas station's business operations. The Supreme Court held in *Kiger* that the insurance coverage would be illusory if the insurers could deny

coverage for environmental liabilities arising from such a large part of the business operations. 662 N.E.2d at 945–46. We agree with the trial court's assessment that perchlorate was a necessary ingredient in SFC's business, the manufacture of signal flares. Denying coverage on the basis that perchlorate is a pollutant would render the coverage for environmental liabilities illusory.

The Insurers also claim that our Supreme Court has retreated from *Kiger*, and cite to the Supreme Court's decision in *Freidline v. Shelby Insurance Co.*, 774 N.E.2d 37 (Ind.2002) in support of their claim that the holdings of cases following *Kiger* should be limited to their facts. We disagree with that claim, as did the trial court, since our Supreme Court summarily affirmed our finding that the absolute pollution exclusion at issue in *Freidline* was ambiguous and unenforceable, continuing to follow *Kiger* and its progeny.[7] 774 N.E.2d at 40. The Supreme Court's comments in *Freidline*, that the scope of pollution exclusion is an "evolving area of the law, subject to differing interpretations," were made in the context of deciding the bad faith claim against the insurer who took the position that it had no duty to defend, and did not signal the Supreme Court's retreat from *Kiger*. *Id.* at 42.

Because we find that the pollution exclusion is ambiguous and unenforceable under *Kiger* and the line of cases following *Kiger*, we need not address the Insurers' argument about conversations about pollution claims between SFC and insurance brokers. The pollution exclusion does not relieve the Insurers of their duty to defend SFC.

### IV. Existence of a Suit

▮▮▮ The Insurers contend that the trial court erred in concluding that SFC's entry into the VRP constitutes a "suit" for purposes of the insurance policies. The Insurers' policies with SFC provide in pertinent part regarding the duty to defend:

> We will have the right and duty to defend any insured against a suit seeking damages for bodily injury, property damage, advertising injury, or personal injury. However, we will have no duty to defend any insured against a suit seeking damages to which this insurance does not apply.

*Appellants' App.* at 2955.[8] More specifically, the Insurers argue that the trial court incorrectly concluded that SFC's entry into Indiana's VRP constituted a "suit" for purposes of their duty to defend as its participation was voluntary, not adversarial. The trial court relied on this court's decision in *Dana Corp.* to find that SFC's voluntary participation in remediating the Indiana site constituted a "suit." 690 N.E.2d at 290, 298; *Appellants 'App.* at 76.

' "The junction where environmental law meets insurance law is an inappropriate place to erect an inflexible rule requiring the initiation of a traditional lawsuit as a condition precedent to the insurer's obligation to defend.'" *Dana Corp.*, 690 N.E.2d at 291–92 (quoting *Professional Rental, Inc. v. Shelby Ins. Co.*, 75 Ohio App.3d 365, 599 N.E.2d 423, 428 (1991)). In *Dana Corp.*, we affirmed the trial court "in all respects" with its conclusion that

---

7. *See Seymour Mfg. Co. v. Commercial Union Ins. Co.*, 665 N.E.2d 891 (Ind.1996); *Travelers*, 715 N.E.2d 926.

8. We note that the Chubb policy included in the Appellants' Appendix contains a definition of "suit." *Appellants' App.* at 3576. The Insurers do not make the argument that a suit does not exist per the definition in the policy, but instead argue that this case differs from *Dana Corp.* and its progeny because SFC initiated the contact leading to its participation in the VRP. We address the issue as it is presented to us by the parties.

the definition of "suit" included "in addition to traditional judicial actions[,] ... any coercive environmental administrative proceeding, including ... 'voluntary' clean-up of a site by the policyholder in nominal cooperation with a governmental entity, but under explicit or implicit threat of a formal enforcement action." 690 N.E.2d at 290, 298. As we said in *Dana Corp.*, "[t]o decide otherwise would encourage insureds to not cooperate with governmental agencies, thus running the risk of huge fines, punitive damages, and delay in remediating environmental pollution." *Id.* at 296.

This holding was followed in *Governmental Interinsurance Exchange v. City of Angola*, 8 F.Supp.2d 1120 (N.D.Ind. 1998). The United States District Court for the Northern District of Indiana found that the City of Angola's "cleanup efforts were the result of 'non-CERCLA demands by state ... authorities' or 'voluntary cleanup ... by a policyholder ... in nominal cooperation with a governmental entity ... under explicit or implicit threat of a formal enforcement action.'" *Id.* at 1131 (quoting *Dana Corp.*, 690 N.E.2d at 290). The district court cited to *Riverside Oil, Inc., et al., v. Federated Mutual Insurance Co.*, 1994 WL 904293 (C.D.Ill.1994) and, while applying Indiana law, noted the following:

> The [insurance company] contends that because Indiana ... [has] not brought administrative or judicial enforcement proceedings against the [policyholder] no "suit seeking damages" exists. This logic, however, would encourage insureds like the [policyholder] to resist legitimate government demands that sites be cleaned up pending official actions. The parties could not have intended such a result ... Similarly, the court rejects the cases from other jurisdictions that [give] the term "suits seeking damages" a narrow reading thereby

encouraging uncooperative behavior by insureds seeking coverage. Therefore, the court finds that the ... IDEM demands at issue in this case are "suits seeking damages."

*City of Angola*, 8 F.Supp.2d at 1130–31 (quoting *Riverside*, 1994 WL 904293 at *6).

Here, SFC was aware of the allegations of perchlorate contamination at the California site, and that the manufacturing processes of the Indiana and California sites were similar. SFC had received a clean-up and abatement order from the California Regional Water Quality Control Board. In Indiana, SFC participated in the VRP and subjected itself to the requirements of the VRP, the failure with which to comply would expose SFC to enforcement actions and potential civil penalties. *See* Ind.Code Chapter 13–30–4 (civil penalties for violation of various environmental management or pollution control laws); Ind.Code Chapter 13–30–9 (environmental legal actions). As the term "suit" is not limited to traditional judicial actions, we find that the trial court correctly applied *Dana Corp.* in finding that SFC's participation in voluntary remediation is a suit for purposes of the duty to defend.

## V. Duty to Defend

The trial court granted SFC's motion for partial summary judgment declaring the Insurers' duty to defend. First, the Insurers claim that the trial court erred by finding that, in general, possible coverage defenses do not relieve an insurer of the duty to defend. Next, the Insurers argue that the trial court erred by concluding that the Insurers had a duty to defend all of the lawsuits stemming from the property damage at the California site, when SFC submitted just two of the complaints in support of its motion for summary judgment.

SFC argued in its motion for partial summary judgment that policyholders are entitled, as a matter of law, to a defense, or the payment of defense costs, for environmental liability actions under CGL policies. SFC argued that the policies in *Seymour Manufacturing. Co., Inc. v. Commercial Union Insurance Co.,* 665 N.E.2d 891 (Ind.1996), a case in which a duty to defend was found, involved policies identical to those that the Insurers sold to SFC. The Insurers, on the other hand, claimed that the policy exclusions clearly relieved the Insurers of a duty to defend SFC as all coverage was excluded.

In general, environmental liability claims are potentially covered under CGL policies and many cases hold that CGL insurers are obligated to defend and/or indemnify their policyholders. *See, e.g.,Kiger,* 662 N.E.2d 945; *Travelers,* 715 N.E.2d 926; *Hartford,* 690 N.E.2d 285. The claims at issue indeed involve environmental liability claims. The Insurers do not dispute that the policies at issue contain essentially the same "duty to defend" language which was at issue in *Seymour.* Thus, the claims are at least potentially covered under the Insurers' policies. As we have previously stated:

> An insurance company's duty to defend is broader than its duty to indemnify. The law in this jurisdiction is well settled that where an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by the policy, the insurer may

properly refuse to defend. However, an insurer refusing to defend must protect its interest by either filing a declaratory judgment action for a judicial determination of its obligations under the policy or hire independent counsel and defend its insured under a reservation of rights. As we have indicated, an insurer can refuse to defend or clarify its obligation by means of a declaratory judgment action. If it refuses to defend it does so at its peril.

*Walton v. First Am. Title Ins. Co.,* 844 N.E.2d 143, 146 (Ind.Ct.App.2006), *trans. denied* (internal citations and quotations omitted). Consequently, the trial court did not err by following *Seymour* and concluding that the Insurers owed SFC a duty to defend and/or indemnify.

Because we have concluded that California substantive law should apply to claims involving the California site, and the trial court applied Indiana substantive law to all claims, we remand the issue of the Insurers' duty to defend claims related to the California site to the trial court.

Affirmed in part, reversed and remanded in part.

RILEY, J., and MATHIAS, J., concur.