FLAUM, Circuit Judge.
Plaintiff-appellant West Bend Mutual Insurance Company (“West Bend”) appeals from the grant of summary judgment in favor of appellees, who consist of a group of insurance companies that includes the United States Fidelity and Guaranty Company (“Fidelity”) and Federated Mutual Insurance Company (“Federated”). West Bend initially sued the defendants for breach of contract because Federated declined to defend a mutual insured in a class action alleging that insured’s gas station contaminated groundwater in a residential neighborhood. The case revolves around whether the pollution exclusion contained in Federated’s policy effectively limited coverage for gasoline spills under Indiana law. The district court found that a clause in Federated’s policy excluded coverage for this type of claim and granted summary judgment in favor of Federated, Fidelity, and other insurers. West Bend now appeals this judgment as it applies to Federated.
For the following reasons, we affirm.
I. Background
MDK is a corporation that owned a gas station in Goshen, Indiana, which stored its retail gasoline in underground tanks. In September 1996, MDK notified the Indiana Department of Environmental Management (“IDEM”) of a leak from these tanks. Over the following years, MDK procured a variety of monitoring and engineering services designed to control and repair the leak. In 1998, MDK sold the gas station to Southland Corporation.
During the period when it owned the gas station, MDK held insurance coverage from a series of companies: Fidelity from 1980 to 1990, Indiana Insurance from 1990 *920 to 1995, West Bend from December 1995 to 2001, and Federated from 2001 to 2003. In September 2002, the Bowens family and other individuals who lived near the gas station commenced a class action lawsuit (“the Bowens action”) against a group of defendants that included MDK. Plaintiffs alleged that gasoline had leaked into groundwater and migrated beneath the nearby Jackson Street neighborhood, causing personal injury and property damage to people whose homes were inundated with toxic fumes.
In September 2002, MDK requested that West Bend provide it with a defense; West Bend complied, subject to a reservation of rights to dispute coverage. MDK made a similar request to Federated, which declined coverage on the grounds that its policy featured a pollution exclusion as well as other coverage limitations. Eventually, West Bend paid $4 million to settle the class action.
The case before us centers on whether the Federated insurance policy covered claims put forth in the Bowens action. Federated provided a commercial general liability policy (“CGL”) to MDK from October 1, 2001 to October 1, 2003, which insured the company from liability to others for property damage and bodily injury occurring within the policy period. The policy stated:
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of “bodily injury” or “property damage” to which this insurance applies. We will have the right and duty to defend the insured against any “suit” seeking those damages.
b. This insurance applies to “bodily injury” and “property damage” only if:
(1)The “bodily injury” or “property damage” is caused by an “occurrence” that takes place in the “coverage territory”;
(2) The “bodily injury” or “property damage” occurs during the policy period; and
(3) [The Known Loss Exclusion ] Pri- or to the policy period, no insured ... knew that the “bodily injury” or “property damage” had occurred, in whole or in part....
e. [Continuous Injury Endorsement ] “Bodily injury” or “property damage” which occurs [sic] during the policy period and was not, prior to the policy period, known to have occurred by any insured ... includes any continuation, change or resumption of that “bodily injury” or “property damage” after the end of the policy period.
The policy then stipulated that bodily injuries or property damage occur at the earliest time the insured learns about them. A coverage limitation endorsement further provided that the policy “does not apply to, and the Company shall have no duty to defend, any claim seeking ‘bodily injury’ or ‘property damage’ that occurred before the policy period, regardless of whether that ‘bodily injury’ or ‘property damage’ is also deemed to have occurred during the policy-period of this policy.”
The Federated policy featured a Pollution Exclusion Endorsement, which excluded coverage for the following:
f. Pollution [The Pollution Exclusion ]
(1) “Bodily injury” or “property damage” arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of “pollutants”:
(f) At or from any tank, piping, pumps or dispensers at premises, sites or locations in addition to those described in subparagraphs (a), (b), (d) *921 or (e), which are or were at any time owned, leased, installed, removed, tested, repaired or filled by or on behalf of any insured, wherever located (except at residences primarily used for dwelling purposes) which contain, transport or dispense or are designed to contain, transport or dispense:
(I) motor fuels;
(ii) kerosene;
(iii) lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of any “auto,” “mobile equipment,” watercraft or aircraft; or
(iv) waste lubricants or other operating fluids which are or were needed to perform the normal, electrical, hydraulic or mechanical functions necessary for the operation of any “auto,” “mobile equipment”, watercraft or aircraft;
including, but not limited to, their constituent parts and other irritants or contaminants found therein.
Motor fuels means petroleum or a petroleum-based substance that is typically used in the operation of a motor or engine, including but not limited to gasoline, aviation fuel, number one or number two diesel fuel, or any grade of gasohol. [“Motor Fuels ” Definition ]
In a separate part of the policy that defines quoted terms, Federated stated that “pollutants” mean “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.” Notably, this definition did not specifically include gasoline.
The Federated policy also included an Indiana Changes Endorsement, which stated that the Federated Pollution Exclusion “applies whether or not such irritant or contaminant has any function in your business, operations, premises, site or location.” In addition to the CGL policy, MDK held “Umbrella” excess liability and “products-completed operations hazard” coverage from Federated. The former tracked the scope of the CGL, while the latter supplemented it.
The district court ruled from the bench in favor of defendants-appellees because “the pollution exclusion in the ... policy bars a defense in coverage.” It did not reach the issue of whether the Known Loss Exclusion also preempted West Bend’s claim, but it did conclude that the products-completed operations hazard coverage was not an alternative source of an obligation to defend the Bowens action.
II. Discussion
We review a district court’s grant of summary judgment de novo. First Nat’l Bank v. Cincinnati Ins. Co., 485 F.3d 971, 976 (7th Cir.2007). A grant of summary judgment is appropriate if “there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c).
Indiana law governs this case and our task is to interpret the Federated policy accordingly. To do so, “[w]e construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs.” Briles v. Wausau Ins. Cos., 858 N.E.2d 208, 213 (Ind.Ct.App.2006). Generally, we give words their ordinary meaning, Holtzclaw v. Bankers Mut. Ins. Co., 448 N.E.2d 55, 59 (Ind.Ct.App.1983), though where ambiguity exists, we read insurance policies strictly against the insurer. Fid. & Deposit Co. of Md. v. Pettis Dry Goods Co., 207 Ind. 38, 190 N.E. 63, 65 (1934).
*922 Under Indiana law, the insurer’s duty to defend is broader than his contractual obligation to provide coverage, but this duty is not boundless. “[W]here an insurer’s independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by a policy, the insurer may properly refuse to defend.” Liberty Mut. Ins. Co. v. Metzler, 586 N.E.2d 897, 901 (Ind.Ct.App.1992). That is, when an exclusion precludes coverage, the insurer does not have a duty to defend. Trisler v. Ind. Ins. Co., 575 N.E.2d 1021, 1023 (Ind.Ct.App.1991).
Of foremost importance in this case is the holding of the Indiana Supreme Court in American States Insurance Co. v. Kiger, 662 N.E.2d 945 (Ind.1996): “[i]f a garage policy is intended to exclude coverage for damage caused by the leakage of gasoline, the language of the contract must be explicit.” Id. at 949. The court reached this conclusion upon examining a claim factually similar to the one now before us. In Kiger, a gas station owner (Kiger) was looking to receive reimbursement from its insurer (American States) for costs associated with cleaning up a gasoline spill from an underground storage tank. The policy in question contained a pollution exclusion that removed coverage for “ ‘[b]odily injury,’ ‘property damage’ or loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of ‘pollutants.’ ” Id. at 948. The definition of “pollutants” in the American States policy was identical to that in the policy of Federated: “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.” Id. Unlike the Federated policy, however, American States made no mention of motor fuels or gasoline elsewhere in its contract.
The Kiger court examined the policy in light of its preference for narrowly interpreting exclusions to insurance coverage. See Pettis Dry Goods Co., 190 N.E. at 65. It expressed surprise at the possibility that “an insurance company would sell a ‘garage policy’ to a gas station when that policy specifically excluded [gasoline,] the major source of potential liability” for the insured. Kiger, 662 N.E.2d at 948. Nonetheless, the court remained bound by the rule that “if the policy clearly excludes such coverage, that contract will be enforced,” id., and focused on whether American States adequately identified gasoline as an uncovered pollutant.
The court first reasoned that a facial reading of the definition of “pollutants” would eliminate coverage for many routine gas station incidents. For example, Kiger would not be covered against a personal injury suit by a customer who slipped on an oil slick because oil was ostensibly a chemical within the scope of the exclusion. The Indiana Supreme Court next observed that gasoline is not necessarily a pollutant from the perspective of a gas station owner who dedicates his days to selling the substance. That is, the gasoline in question burned just fíne and lacked foreign “contaminants.” Only when it accidentally seeped out of the gas station did it become a contaminant itself, leading to an ambiguity about whether the pollution exclusion could apply to a substance that was not acting as a pollutant for the bulk of the insurance term. The court determined that the policy did not resolve this ambiguity and proceeded to interpret it against the defendant drafter and in favor of coverage. The Kiger opinion summarized this position with the previously cited rule requiring explicit exclusion of gasoline from garage policies.
The validity of the district court’s decision comes down to whether the Fed *923 erated policy satisfies the Kiger requirement for explicit contracts. Predictably, West Bend and Federated differ in their interpretation of this requirement. Appellants argue that “liability policies sold to gasoline retailers, if they were to exclude liability for gasoline contamination, should explicitly define ‘pollutant’ to include gasoline.” Appellees instead assert that the Kiger standard is satisfied whenever the totality of the policy explicitly excludes gasoline, relying on the words of the decision itself, the rule that contracts must be construed as a whole, and Indiana’s decision to place a duty on insureds “to read and to know the contents of their insurance policies.” Safe Auto Ins. Co. v. Enter. Leasing Co. of Indianapolis, Inc., 889 N.E.2d 392, 397 (Ind.Ct.App.2008).
Appellants’ argument does not stand up to scrutiny. A fair reading of Kiger cannot lead to the conclusion that the explicit exclusion must be located in one particular part of the policy. Such an outcome would be anomalous in light of broad norms of contract interpretation and illogical when considering the motivation of the Kiger court. While the definition of “pollutants” in the Federated policy is identical to the one Indiana courts evaluated in Kiger, the Federated Pollution Exclusion itself clearly includes motor fuels, which the “Motor Fuels” Definition then explicitly applies to gasoline (“Motor fuels means petroleum or a petroleum-based substance that is typically used in the operation of a motor or engine, including but not limited to gasoline .... ”). The plain language of the contract thus explains that Federated will not cover property damage or personal injuries related to gasoline. This conclusion is buttressed by the fact that the Indiana Changes Endorsement applies the Pollution Exclusion “whether or not such irritant or contaminant has any function in [MDK’s] business, operations, premises, site or location.” Together, these provisions eradicate the ambiguities on which Kiger rested. A gas station owner presumed by Indiana law to have read the insurance policy would know to a certainty that Federated would not be responsible for damage arising out of gasoline leaks taking place during the covered period.
West Bend cites to Freidline v. Shelby Ins. Co., 774 N.E.2d 37 (Ind.2002), but that case lends little support to appellants’ preferred reading of the applicable exclusion standard. In the relevant portion of Freidline, the Indiana Supreme Court summarily affirmed a lower court’s conclusion that a definition of “pollutants” identical to the one in the Federated policy and Kiger could not exclude coverage for “fumes emanating from carpet glue.” Id. at 40. The text of Freidline, however, suggests that the Supreme Court did not focus solely on the individual definition clause in arriving at its conclusion. In fact, the brevity of the discussion indicates most strongly that nothing in the Shelby Insurance contract as a whole provided grounds for denying coverage, making it unnecessary for the court to discuss each of the irrelevant provisions in any detail. Similarly, in Travelers Indemnity Co. v. Summit Corp., 715 N.E.2d 926, 935 (Ind.Ct.App.1999), the court concluded that the scope of the policy pollution exclusion was ambiguous after examining both the exclusion itself, which identified methods of release but said nothing about specific substances, and the definition of pollutants, which was again identical to that in Kiger.
Finally, the recent decision of the Indiana Court of Appeals in National Union Fire Insurance v. Standard Fusee Corp., 917 N.E.2d 170 (Ind.Ct.App.2009), is equally unavailing for West Bend. There, the court inquired whether a pollution exclusion substantially similar to the one in Kiger, with an identical definition of “pollutant” and no mention of gasoline, tanks, or motor fuels, applied to potential leaks of a *924 chemical involved in the manufacture of flares. It determined that, like in Kiger, a facial reading of the sweeping clause would prevent the policy from covering much of anything. The court thus found the exclusion to be ambiguous. Upon applying the presumption that insurance contracts must be read to establish coverage, it held that “perchlorate was a necessary ingredient in SFC’s business, the manufacture of signal flares. Denying coverage on the basis that per-chlorate is a pollutant would render the coverage for environmental liabilities illusory.” Id. at 185. The National Union court’s reasoning focuses on the definition of “pollutant” because National Union did not appear to suggest that any other clause in its contract could excuse coverage, not because the gasoline exclusion can only work if placed in some specific spot.
We thus conclude that the Pollution Exclusion in the Federated policy was sufficiently explicit to exclude gasoline contamination from coverage. Since the Pollution Exclusion successfully frees appellees from the obligation to defend the Bowens action based on the main CGL policy, we do not reach the question of whether the Continuous Injury Endorsement or Known Loss Exclusion provide parallel paths to the same conclusion. We must still consider, however, whether the district court erred in holding that neither the excess liability coverage nor the products-completed operations hazard coverage contained in the supplemental Federated Umbrella policy provide grounds for the relief that West Bend seeks.
With respect to the Excess Liability coverage, the plain language of the contract answers the question. The relevant part of Federated’s Commercial Umbrella Liability Policy reads:
A. EXCESS LIABILITY COVERAGES
Except as excluded under the underlying insurance, we will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages that are covered by underlying insurance:
a) because of bodily injury, personal injury, property damage or advertising injury as defined within the applicable underlying insurance; and
b) which are in excess of the applicable underlying insurance limit.
With respect to A. EXCESS LIABILITY COVERAGES all exclusions contained within the applicable underlying insurance apply.
The Federated policy thus makes Excess Liability coverage coextensive with the primary CGL coverage. Since the CGL policy effectively excludes liability from gasoline leaks, the Excess Liability policy does the same.
Appellant next argues that even if the pollution exclusion in the CGL applied to gasoline, the Additional Liability Coverages in Federated’s Umbrella policy provide an alternative ground for relief. The relevant provision insures damages from an “occurrence” during the policy period that arises from the “products-completed operations hazard,” which in turn includes
[A]ll “bodily injury” and “property damage” occurring away from premises you own or rent and arising out of “your product” or “your work” except:
a. products that are still in your physical possession; or
b. work that has not yet been completed or abandoned.
The Umbrella policy defines “your product” to mean
a. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:
(1) you;
*925 (2) others trading under your name; or
(3) a person or organization whose business or assets you have acquired; and
b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
Federated excludes injury or property damage caused by pollutants from Additional Liability Coverage, but defines “pollutants” differently than in the primary CGL policy. The Umbrella definition of “pollutants” describes the premises from which they may escape but then explains that “[pjollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.” "While this definition is identical to the one in Kiger (both make no mention of gasoline or liquids comprising the primary product of the insured), it cannot lead to Federated’s liability for the Bowens action here. The definition of “pollutants” here modifies only the products-completed operations hazard coverage, which, unlike a general commercial policy, does not insure damage from accidental release as a matter of law.
On the one occasion the Indiana Supreme Court has dealt with this subject, it interpreted a products-completed operations hazard clause to describe “claims arising from the placement of defective goods into the stream of commerce by the insured.” B & R Farm Serv., Inc. v. Farm Bureau Mut. Ins. Co., 483 N.E.2d 1076, 1077 (Ind.1985). Appellees argue that this case controls the interpretation of the Federated Umbrella Policy and requires us to find that, as a matter of Indiana law, the products hazard clause therein cannot reach accidental spills. That position is too strong. Unlike the present case, B & R Farm Services interpreted an exclusion to an insurance contract, not a grant of coverage. Since the purchaser of insurance generally cannot negotiate the precise wording of the policy, courts view these two types of provisions through distinct presumptive lenses. All things being equal and with deference to the text of the contract, we favor broad readings of coverage grants and narrow constructions of coverage exclusions. In this light, the Indiana Supreme Court’s pronouncement of the meaning of products-hazard clauses appears less absolute than the appellees ask us to believe. B & R Farm Services certainly controls the scope of exclusions denying insurance to injuries arising out “completed products,” but the case serves only as persuasive authority for the proper interpretation under Indiana law of clauses purporting to grant strictly that coverage necessary to insure injuries from those same “completed products.”
The impact of B & R Farm Services on this case is further attenuated by the fact that the Farm Bureau Mutual policy underpinning that dispute was worded somewhat differently than the Federated Umbrella policy. The former, unlike the latter, contained an active verb, excluding coverage for products that have been “relinquished” to others.[1] The Indiana Supreme Court focused on this language to reach its holding (“We deem the act of relinquishment to be one which necessarily involves volition, not something which occurs accidentally or involuntarily,” id.).
*926 Despite these differences in posture, B & R Farm Services proves informative on the proper meaning of the Federated products-hazard clause. When the Indiana Supreme Court “deemed” the act of relinquishment to require volition, it relied on general distinctions between theories of liability, not on dictionaries. We apply this approach here to determine that, despite weak wording,[2] the Federated products-hazard clause covered only knowingly completed market transactions and abandoned product. See also Ohio Cas. Ins. Co. v. Reed, 2006 WL 2348957, at *7 n. 3, 2006 U.S. Dist. LEXIS 56625, at *22 n. 3 (S.D.Ind. Aug. 11, 2006) (“Indiana courts likely would find that accidental chemical contamination does not fit within the scope of products hazard coverage.”). There is no doubt that the Bowens action was predicated on accidental leak of gasoline from MDK’s storage tanks and West Bend never contended that the gas station abandoned its product. Therefore, the Federated Umbrella policy does not provide an independent source of recovery for the appellants.
III. Conclusion
For the foregoing reasons, we AFFIRM the district court’s grant of summary judgment in favor of Federated.

. The clause stated, in relevant part, that the policy excluded "bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from the premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.”

. The definition of “Products-completed operations hazard" within the Umbrella policy does not define “abandoned” but explains that
“Your work” will be deemed completed at the earliest of the following times:
a. when all of the work called for in your contract has been completed;
b. when all of the work to be done at the site has been completed if your contract calls for work at more than one site; or
c.when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.